**AMERICAN PAPER & PULP CO., Inc.,**

v.

**Maurice DENENBERG, Individually and Trading as Denny Paper & Board Co., Appellant (Lansdowne Paper Mill, Inc.)**

No. 11792.

United States Court of Appeals Third Circuit.

Argued March 22, 1956.

Decided May 21, 1956.

Harold E. Kohn, Philadelphia, Pa., (Aaron M. Fine, Dilworth, Paxson, Kalish & Green, Philadelphia, Pa., on the brief), for appellant.

Martin Feldman, Philadelphia, Pa., (Sydney Krause, Krause, Hirsch, Levin & Heilpern, New York City, on the brief), for appellee.

Before MARIS, McLAUGHLIN and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

In this diversity case a buyer has obtained redress against a seller for an alleged breach of warranty of the quality of goods sold and delivered. The trial judge, sitting without a jury, found for plaintiff, American Paper & Pulp Co., against defendant, Denenberg, in the amount of $6,023.26, and made a like award to defendant against a third-party defendant who had manufactured and supplied the goods. However, the third-party defendant did not defend the action because prior to trial it had gone out of business and, apparently, was judgment-proof.

The goods were sold and delivered in Pennsylvania in 1951 and all controverted legal issues are controlled by the law of Pennsylvania. The date is relevant because the Sales Act, 69 Purdon's Stat., c. 1, rather than the Article of the Uniform Commercial Code on Sales, effective July 1, 1954, 12A Purdon's Stat., art. 2, was then the controlling statute.

Although the seller does not admit any breach of contract, the evidence so clearly supports the district court's conclusion that the seller both gave and breached a warranty of quality that no discussion of this issue of basic liability is necessary. The real difficulties of the case concern the buyer's election of remedy and the proper measure of damages.

These are the essential facts. The seller, Denenberg, contracted to sell to the buyer, American, 55 tons of pure MF Kraft paper in two lots, one of 33 tons and the other of 22 tons as per sample. Both parties were middlemen, Denenberg being a broker and American, an exporter of paper. The contract required the seller to deliver the paper alongside a vessel at the port of Philadelphia in cases marked to show consignment to Topic and Nell, a South African customer to whom American contracted to resell this merchandise.

Denenberg purchased the paper to fill the American order from the third-party defendant, Lansdowne Paper Mill, Inc. Thereafter, in accordance with shipping instructions the seller had the 33 ton lot of paper delivered to an ocean carrier at the port of Philadelphia. Also, out-turn samples, said to have been taken at random from the rolls during the manufacturing of the paper, were mailed directly to American, but were not received until the goods had left Philadelphia enroute to South Africa. Finding the out-turn samples clearly inferior to the quality of the original samples upon which the contract to sell had been based, American advised Denenberg of this fact by letter and cancelled the order for the undelivered 22 tons. At the same time, in payment for the 33 tons already enroute to South Africa, American remitted $7,746.13, which was 80% of the agreed purchase price of $9,682.66. The balance was withheld with a view to making some mutually satisfactory adjustment with the South African purchaser on the inferior quality of the paper. However, inspection on arrival in South Africa proved the paper even worse than anticipated and Topic and Nell notified American that it was rejecting the entire shipment. Because of the expense of returning the 33 tons of paper from South Africa, and with the concurrence of the parties, the paper was eventually sold in South Africa for $4,568.00 and this sum was remitted by Topic and Nell to American.

In the meantime, upon shipment of the paper from the United States, Topic and Nell had already paid American the sum of $11,856.88, the full agreed resale price of the paper. But, when the shipment was rejected, American did not refund this money to Topic and Nell. Instead, the parties agreed that American would replace the defective paper, entirely at its own expense, with paper of proper quality. This was done, utilizing paper which American subsequently obtained from a manufacturer at a time when the market had dropped considerably. The cost of such replacement was $5,232.09, as contrasted with the earlier contract, now in suit, to buy similar paper from Denenberg for $9,682.66. This arrangement enables American to retain the full amount paid by Topic and Nell for the Denenberg paper, and in the process to realize not only the middleman's profit originally inherent in the transaction, but also an additional profit representing the difference between the price it had agreed to pay Denenberg and the smaller price it actually paid for replacement merchandise, provided that American can get back from Denenberg the $7,746.13 already paid to him.

This brings us to an examination of the conduct of American, as it bears upon the choice of an appropriate remedy against Denenberg. It has already been stated that American notified Denenberg that the out-turn samples were unsatisfactory as soon as they were received. At the same time it announced its election to "cancel" the contract of sale as to the lot of paper yet to be delivered. This was its privilege upon discovery that the first shipment was of poor quality and below the agreed standard. Indeed, Denenberg seems not to have objected to this cancellation. But whether by mutual assent or through unilateral action justified by a breach, it is clear that the contract to sell the second or 22 ton lot of paper was rescinded.

As to the 33 tons, which were on the high seas when samples were received, American told Denenberg it would mini-

mize loss as best it could by trying to get Topic and Nell to accept the goods at a reduced price. In optimistic anticipation that this could be accomplished, American then transmitted 80% of the contract price to Denenberg. There followed the inspection of the paper on arrival in South Africa, the discovery that it was even worse than the samples indicated, and the total rejection of the shipment by Topic and Nell. In these circumstances, as the district court explicitly found, all parties concerned agreed that the paper be sold for whatever it would bring in South Africa, since its value did not warrant the expense of shipment back to the United States. This was done.

In the meantime American repeatedly asked Denenberg to state what he would do to discharge his obligation in the premises. Denenberg's answers were to the effect that he first wanted to know what salvage value could be realized by resale of the paper in South Africa. Dissatisfied with the seller's refusal to make any commitment, American then made its first specific demand, namely, that Denenberg return the $7,746.13 already received in payment for the paper and also reimburse American for the costs of shipment to South Africa which it had defrayed.

Denenberg did not comply with that demand and the present suit followed. The complaint itemized American's claim. It asked for the return of the purchase price and reimbursement for shipping expenses, as theretofore demanded. It also added to the claim a new item, $1,329.79, identified as the profit American would have made on resale of both the 33 ton lot and the 22 ton lot had Denenberg performed as promised. Finally, the complaint recognized the right of Denenberg to the salvage value of the defective paper as sold on the South African market.

In these circumstances we are satisfied that the conduct of American amounted to an election to rescind the entire sale, including the 33 ton lot actually delivered. The demand for repayment of the purchase price, the offer to return the salvage value of the 33 ton lot as the agreed substitute for, or equivalent of the paper itself, and the ignoring of the advantageous settlement of the resale contract with Topic and Nell as no concern of Denenberg, all combine to support the conclusion that American was undertaking to disaffirm and abrogate the sale, getting back what it had put into the transaction and leaving the Topic and Nell contract as an independent transaction to be worked out by the parties thereto.

But, however American may try now to disaffirm the sale it must be considered whether this buyer had already acted in such a way as to disable itself in law from utilizing the remedy of rescission. More specifically we must inquire whether American unreasonably delayed its demand for refund and whether its dealing with the goods received from Denenberg was consistent with the disavowal of the sale, upon which rescission is predicated.

This aspect of the controversy is controlled by Section 69 of the Sales Act. 69 Purd.Stat. § 314. This section states the following limitation on the buyer's right of rescission for breach of warranty: "Where the goods have been delivered to the buyer, he cannot rescind the sale if he knew of the breach of warranty when he accepted the goods, or if he fails to notify the seller within a reasonable time of the election to rescind, or if he fails to return or to offer to return the goods to the seller in substantially as good condition as they were in at the time the property was transferred to the buyer."

In the present case, the agreed delivery of the goods ship-side for forwarding overseas and the fact that outturn samples were not received until the ship had sailed, make it reasonable that the election to rescind should remain open until the quality and condition of the goods could be determined by inspection on arrival at their indicated destination. Cf. Baker v. J. C. Watson Co., 1943, 64 Idaho 573, 134 P.2d 613. And

see the criticism of a contrary conclusion reached under the English Sale of Goods Act, in 62 Harv.L.Rev. 1411.

■ But even when the poor quality of the goods was fully revealed American did not take decisive action immediately. Rather it informed Denenberg of the situation and sought some proposal of redress from him. However, we think the legal concept of reasonable conduct by the buyer should be so framed as to sanction rather than penalize this normal behavior of the well disposed businessman who seeks such amicable adjustment before otherwise committing himself. Thus, a demand for the return of the sale price when it became apparent that the seller would not take proper responsibility for the unmarketable quality of the merchandise, came soon enough to preserve the right of rescission. Pennsylvania cases in analogous situations seem to support this view. Cf. Montgomery Foundry & Fittings Co. v. Hall Planetary Thread Milling Mach. Co., 1925, 282 Pa. 212, 127 A. 633; Randal v. Mitchell Motor Car Co., 1919, 263 Pa. 425, 106 A. 783.

The statute also provides that the rescinding buyer shall return the goods sold and delivered to him. In this case we think the seller has rather clearly waived the return of the actual goods. Indeed, no claim is made even now that the failure to return the goods precludes the buyer from getting back what he paid for them. It has already been pointed out that the seller was advised of the condition of the goods on arrival and agreed that they be sold in South Africa for whatever their salvage value might be. Indeed, Denenberg's repeated statements that he wanted to know how much would be realized on this salvage operation before committing himself to restitution make it all the clearer that he had consented to this resale and to the substitution of the salvage price for the goods in any final settlement of the controversy.

■■ The Pennsylvania courts recognize that principles of equity may excuse the normal duty of a rescinding party to return the goods. Douglass v. Universal Auto Sales Corporation, 1924, 83 Pa.Super. 312; Sloane v. Shiffer, 1893, 156 Pa. 59, 27 A. 67 (at common law). We are satisfied that, applying such principles here, Pennsylvania would regard the tender of the salvage price as a satisfactory equivalent of tendering the goods themselves. It follows that the buyer is entitled to the remedy of rescission.

■ But, beyond the claim to get back what he paid for the defective merchandise, the buyer also is claiming his actual expenditures in handling and forwarding the paper and also the profits he would have made on resale of the goods to Topic and Nell. Section 69 of the Sales Act, conferring the right to rescind and recover the purchase price as one of the alternatives open to the injured buyer, says that "when the buyer has claimed and been granted a remedy in one of those ways, no other remedy can thereafter be granted." It has been argued at length and rather persuasively by commentators and some courts that despite this language, a court may allow damages, though not profits, as an adjunct of rescission to the extent necessary to reestablish as nearly as possible the situation of the buyer before the sale. The cases are cited and discussed in Rogge, Damages Upon Rescission for Breach of Warranty, 1929, 28 Mich.L. Rev. 26; Note, 1938, 38 Col.L.Rev. 888; 1936, 45 Yale L.J. 1313. But, whatever merit this view may have, many courts have not adopted it in their administration of the Sales Act. Among them, the Supreme Court of Pennsylvania has stated its position quite explicitly:

"If we assume, under the facts above set forth, that the rescission of the contract was the act of plaintiff alone—and this is the basis of its claim—then it is entitled to recover, in accordance with subsection (d), above quoted, 'the price or any part thereof which has been paid' by it, and nothing more. * * That a vendee who rescinds can only recover upon that basis is evident,

for it is exactly what the statute declares, in paragraph first, subsection (d), and in paragraph fourth, each quoted above. Indeed, in subsections (a), (b), (c), and (d) there is set forth what every vendee is entitled to recover, in the various contingencies therein expressed, and they are the limit of recovery in each instance: expressum facit cessare tacitum. And so it is said in 2 Williston on Sales, 1536 (2d Ed.)  *  *." See Stanley Drug Co., to Use of Laboratory Institute, Inc., v. Smith, Kline & French Laboratories, 1934, 313 Pa. 368, 370, 170 A. 274, 275.

This language is probably broader than the exigencies of the case then before the court. But, whether the court needed to go that far or not, we think we should be guided by this clear statement of the view of the highest court of the state in our ruling on the point of state law it covers.

It is also noteworthy that the Uniform Commercial Code, as recently adopted in Pennsylvania, takes cognizance of the questionable stringency of the rule which denies damages to the rescinding buyer under the Sales Act and permits rescission to be accompanied by consequential damages. 12A Purd.Stats. § 2–711. See also Note, 1949, 33 Minn.L.Rev. 406, 415–20. And the explanatory note which Purdon appends to this section expresses the view that its enactment changes the rule of Stanley Drug Co., to Use of Laboratory Institute, Inc., v. Smith, Kline & French Laboratories, supra.

 We conclude, therefore, that under the Pennsylvania Sales Act the buyer in this case, having elected to get back the price he paid, is entitled to that sum, restoring to the seller at the same time the monetary equivalent of the goods sold. But more than that he cannot get under the remedy he has chosen. Accordingly, the district court's calculation of damages must be revised to eliminate all items but the $7,746.13 paid for the paper and the offsetting credit of $4,568 allowed in lieu of the return of the paper.

We have considered one other small matter, although neither party has raised it. The district court allowed interest from October 15, 1952, a date which is not significant in our view of the case. The record shows that the buyer demanded his money back from the seller in a letter dated January 11, 1952. Receipt of this letter was acknowledged by the buyer on January 14, 1952. This acknowledgment is the only evidence of the time when the demand was received and, therefore, should determine the date from which interest on the present award is allowable.

Accordingly, the judgment will be modified and reduced to the principal sum of $3,178.13, with interest at 6% from January 14, 1952 and, as modified, the judgment will be affirmed. Neither party shall be awarded costs on this appeal as against the other party.