**ED FINE OLDSMOBILE, INC., a corporation of the State of Delaware, Appellant, Defendant-Below,**

v.

**Thomas S. KNISLEY, III, Appellee, Plaintiff-Below.**

Superior Court of Delaware, New Castle.

April 15, 1974.

---

3. We understand hashish to be a concentrated form of marihuana.

**34**

H. Murray Sawyer, Berg, Komissaroff & Sawyer, Wilmington, for appellant.

Sheldon N. Sandler, Bader, Dorsey & Kreshtool, Wilmington, for appellee.

OPINION

O'HARA, Judge.

Defendant, Ed Fine Oldsmobile, Inc., (hereinafter "dealer"), has appealed from a decision of the Court of Common Pleas, whereby the plaintiff, Thomas S. Knisley, III, (hereinafter "buyer"), was allowed to rescind [1] his purchase of a used automobile.

1. The appellant dealer initially attacks the authority of the Court of Common Pleas by claiming that it does not have the jurisdiction to grant the relief of "rescission". Although the relief granted is more properly charac-terized as judicial recognition and enforcement of the buyer's right to "revoke his acceptance" under 5A Del.C. § 2–608, it is sufficient to note that 10 Del.C. § 1341 gives the Court of Common Pleas concurrent jurisdiction with

In February, 1970, the buyer, visiting dealer's place of business, expressed an interest in a 1968 Oldsmobile, 4–4–2, convertible, which was on display. He was seeking reliable transportation and, knowing that such models had high performance reputations, sought to ascertain the history of the used vehicle in question. He feared that a vehicle of this sort might have been used for racing or contain racing equipment, and if so, did not intend to buy the automobile. Buyer clearly stated this to the defendant's sales agents. They assured him that it had been well-cared for by its previous owner, one of the dealer's mechanics, and that he had neither raced it nor installed any racing equipment in it.

Relying on those assurances, buyer purchased the automobile, taking delivery on February 26, 1970. He immediately began to have difficulties. It burned an excessive amount of oil, hesitated, and ran poorly. On April 3, 1970, dealer took the automobile into its shop for repairs. It was at this time that buyer discovered that several parts of his automobile had, in fact, been altered for racing. Among other things, it had a special racing transmission, a non-stock cam shaft, and racing weights in the carburetor. The dealer replaced these parts without charge and assured the buyer that all defects caused by racing or the use of racing equipment had been remedied.

Thereafter, buyer continued to have difficulties with the automobile. On May 5, 1970, it was placed in dealer's shop for additional repairs, including replacement of the starter. On June 9, 1970, shortly after those earlier repairs had been completed, it was towed to dealer's for the last time. The engine, which had locked after throwing a rod, was completely inoperative.

On condition that he need pay only for the labor costs, buyer agreed to allow the dealer to install a new engine. However, when that work was completed, in late July or early August, dealer told the buyer that

he would also be required to pay an additional $365.00 to replace the transmission which had been stolen while the automobile was in dealer's possession. Confronted with what he considered a final act of bad faith, buyer refused to cooperate any further and left the automobile with the dealer. He then filed suit in the Court of Common Pleas for return of the $2,456.75 he had paid for the automobile.

In his September 7, 1973, decision ordering repayment of that purchase price, with interest, to buyer, the trial judge made several pertinent findings, which can be summarized as follows:

1. That buyer would not have bought an automobile which had been raced or contained racing equipment, and clearly so stated to the dealer's agents;

2. That dealer's agents clearly and knowingly misrepresented to buyer that the automobile he was purchasing contained no racing equipment and had not been used for racing;

3. That when buyer learned that he was the victim of fraudulent misrepresentations, he attempted to rescind the transaction;

4. That each time he so attempted, dealer's agents persuaded him not to by telling him that it would cost an additional $1,000 to replace the automobile with a different model and promising to correct the nonconformities;

5. That since the automobile was in dealer's shop for repairs for two to three months between February 26 and June 9, 1970, buyer had little opportunity to inspect or use it;

6. That the final failure of the engine resulted from the use of racing parts or an oil defect;

the Superior Court which has the authority to grant such legal rescission. See, for example, Rudolph v. Huckman, Del.Super., 267

A.2d 896 (1970), where rescission of the sale of a boat was granted for breach of the implied warranty of merchantability.

7. That buyer was persuaded not to rescind the transaction by dealer's promise to replace the engine for the cost of labor alone; and

8. That dealer reneged on that promise by demanding that buyer also pay for replacement of the transmission stolen while the car was in the dealer's possession.

■ This Court has reviewed the entire record of the trial below and concludes that the above-listed findings are clearly and adequately established therein.[2] Nevertheless, dealer here seeks to have the trial Court's judgment overruled. Essentially, dealer bases this appeal on two grounds: 1) that there was no breach of warranty, express or implied; and 2) that buyer failed to make an effective revocation of his acceptance of the automobile.

■ In making its warranty argument, dealer contends that its obligation to buyer was limited to 100 percent of the repair costs for the first 30 days or 1,000 miles. Dealer quotes language from its standard form purchase agreement to the effect that there existed no guarantee or warranty as to the condition of the vehicle beyond that specifically stated on the purchase agreement or the accompanying "Used Car Warranty" agreement. However, those forms warrantied 50 percent of the repair bills up to a 30 days or 1,000 miles limit. Furthermore, faced with a displeased customer and, perhaps, pangs of conscience, dealer never imposed any time limitation as it repeatedly attempted to correct the vehicle's defects. Dealer will not, therefore, be heard to impose such limitations now.

■ Although dealer apparently waived any right it may have had to hold buyer to a specific written warranty, 5A Del.C. §

2-209(4), there is no need to employ a waiver theory to dispose of dealer's warranty defense. The record clearly indicates, and dealer grudgingly concedes, that his agents knowingly misrepresented the condition of the vehicle. Buyer, to the knowledge of those agents, based his decision to purchase on their misrepresentations. Neither the parole evidence rule nor applicable case law require that buyer be held to the written terms of the purchase contract for his warranties or relief.

In Bill Dreiling Motor Company v. Shultz, 168 Colo. 59, 450 P.2d 70 (1969), the Colorado Supreme Court affirmed a judgment granting rescission to a customer who had purchased a used Studebaker, in reliance on a dealer's misrepresentations as to the vehicle's mileage. The written contract entered into between the parties included a provision that it contained all the terms and representations of the sales agreement. Nevertheless, the trial judge's decision to admit evidence concerning the false representations which the dealer had made as an inducement to the customer to enter into the contract was tersely upheld by the appellate court. "It is sufficient . . . to direct attention to the general rule stated in 24 Am.Jur. Fraud and Deceit § 267, as follows:

'* * * when fraud enters into a transaction to the extent of inducing a written contract, the instrument never becomes a valid contract, and hence, as stated above, the parol evidence rule is not applicable.' "

Similarly, in Beshears v. S–H–S Motor Sales Corporation, 433 S.W.2d 66 (1968), the Missouri Court of Appeals upheld the award of actual and punitive damages to a buyer who purchased an automobile in reliance on the salesman's oral representation that it was a demonstrator when, in fact, it

---

2. 10 Del.C. § 1373, provides that appeals in civil actions from the Court of Common Pleas to the Superior Court "shall be reviewed on the record and shall not be tried de novo". Therefore, in its appellate role, this Court must accord "all reasonable presumptions" to

the trial judge "in favor of the correctness of his view of the evidence." Eastern Shore Public Service Co. v. Town of Seaford, Del. Supr., 23 Del.Ch. 199, 2 A.2d 265 (1938), app. dism. 306 U.S. 616, 59 S.Ct. 483, 83 L.Ed. 1024.

had been repossessed from a prior owner. The Court quickly disposed of a warranty argument resembling that which dealer makes here with this quote from an earlier Missouri decision, Horwitz v. Schaper, Mo.App., 119 S.W.2d 474:

"'The rule that all prior and contemporaneous oral agreements and representations are merged in the written contract entered into by the parties does not apply to fraudulent representations made for the purpose of inducing a party to enter into such contract.'"

■ In the case at bar, the trial judge properly concluded that dealer should not be allowed to profit from his own wrongdoings by strictly holding buyer to the written terms of the sales and warranty agreements. The evidence amply supports the legal conclusion that buyer, at the time he discovered the deception, could have rejected the automobile and had his purchase price refunded. 5A Del.C. § 2–602. See also, Liability for Representations and Express Warranties In Connection With Sale of Used Motor Vehicle, 36 A.L.R.3d 125 (1971); Broude, The Consumer and the Parol Evidence Rule: Section 2–202 of Uniform Commercial Code, 1970 Duke L.J. 881.

This leads, however, to the other prong of dealer's attack on the trial court's decision. Buyer did not reject the automobile when he learned that it actually contained several pieces of racing equipment and that it did not otherwise fulfill his reasonable expectations or the dealer's representations. Instead, faced with a dealer who would not return the purchase price and who promised to remedy the non-conformities, buyer continued to use the vehicle while frequently bringing it to dealer for replacement of racing parts and other repairs. Given this history of buyer patience, dealer now claims that buyer failed to make a timely revocation of his acceptance as required by 5A Del.C. § 2–608.

This provision of the Uniform Commercial Code provides, in pertinent part:

"(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

(a) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; . . .

(2) Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it."

■ There is no doubt that buyer was persuaded to withhold his revocation from early April, when the non-conformities were discovered, until that summer by dealer's refusal to rescind the sale and its assurances that those non-conformities could and would be corrected. Nor is there any question that the final failure of the engine was due to the vehicle's own defects. Therefore, the question must turn on the timeliness of the revocation.

In this regard, it is of limited utility to look to other cases. What may have been too much delay before revocation in one case may be reasonable in another context. Hence, dealer's reliance on Waltz v. Chevrolet Motor Division, Del.Super., 307 A.2d 815 (1973), is misplaced. There, no allegation of fraud was made, much less proven. There, the vehicle in question was suitable for general purposes, failing only to properly haul a horse trailer. There, the buyer continued to use the vehicle after all attempts to cure had failed. There, the buyer waited more than a year before revocation.

Here, on the other hand, although the vehicle had been driven some 1,500 miles, the buyer had had little opportunity for inspection or continued use, since it

was so frequently being repaired. Every attempt at revocation was forestalled by dealer's assurances and foot-dragging. Finally, dealer's attempt to foist the cost of the stolen transmission upon buyer is hardly support for now permitting dealer to profit thereby. Patience is admittedly a virtue. Dealer would here change it into a vice.

The record in this case clearly supports the correctness of the trial judge's conclusion that the buyer's revocation was timely and otherwise appropriate. It will therefore, be affirmed.

It is so ordered.