JAMES SAUERS, Plaintiff-Appellee, *v.* BRUCE TIBBS, Defendant-Appellant.—
(GERRING INDUSTRIES, INC., Defendant.)

Fourth District   No. 13652

Opinion filed May 23, 1977.

Stephen C. Myers, of Myers & Daugherity, of Streator, for appellant.

Julius Lucius Echeles and Carolyn Jaffe, both of Chicago, for appellee.

Mr. PRESIDING JUSTICE CRAVEN delivered the opinion of the court:

On October 19, 1973, plaintiff brought an action based on breach of fitness for a particular purpose (Ill. Rev. Stat. 1973, ch. 26, par. 2—315) arising out of his purchase of a mobile home manufactured by defendant Gerring Industries, Inc., and sold to the plaintiff by defendant Bruce Tibbs, a dealer in mobile homes. The count against Gerring Industries was dismissed at the close of plaintiff's case and the court, after a bench trial, entered judgment for plaintiff against defendant Tibbs and awarded plaintiff $10,185 (purchase price) plus consequential damages of $2686.23 and costs.

The mobile home, a new 1973 "Holly Park," was delivered by the manufacturer to the dealer on May 9, 1973. In the next couple of days it was set up by the dealer and a slide-out room addition was installed. The installation of the slide-out room leaves a large hole in the exterior wall for better than one-half day before the slide-out is secured and caulked making a sealed tight enclosure. Also, during the setup procedure, the doors and windows of the trailer are open for nearly a day. Both defendant Tibbs and his wife, who also works in the business, testified that they saw no bugs in the mobile home upon an inspection made the day it arrived from the manufacturer.

Plaintiff, and his wife, who was then his fiance, purchased the mobile home on May 12, 1973. They testified that on that same day they were in the home with Mrs. Tibbs and that they observed flying insects which Mrs. Tibbs informed them were gnats.

During the week following May 12, plaintiff and his fiance visited the mobile home on several occasions, doing some cleaning and getting the home ready to move into on May 19, their wedding day. They testified that they saw bugs in the trailer between May 12 and May 19. Plaintiff's wife testified that she saw all kinds of insects "flying around" on May 19 and that these bugs were present in the home in slightly increasing numbers from the time they moved in until the day they left for their honeymoon. Plaintiff also testified that the bugs were present in the home from May 12 through June 29 and that their numbers increased during that period.

From June 29 to July 10, the Sauers' were on their honeymoon and the

mobile home was closed. Upon their return on July 10, plaintiff and his wife found their trailer full of bugs "hatched all over the trailer" and "packed on the floor." After July 10, they observed bugs in the bedroom walls behind the paneling, in the insulation underneath the trailer, in the cabinets, the tub, on the curtains, and all over their home.

At some point plaintiff contacted Paul Baietto's pest control company, "Quik-Kill." Mr. Baietto identified the insects infesting the trailer as "confused grain beetles." The plaintiff signed a one-year contract for spraying services with Quik-Kill on July 18, 1973. Quik-Kill made several treatments which required plaintiff and his wife to vacate the trailer for 24 hours and plaintiff and his wife both testified that these efforts were unsuccessful in eradicating the insects. On September 5, plaintiff and his wife moved out of the trailer because, according to their testimony, the bugs were too much of a nuisance and made living conditions impossible. They resided with his parents from September 5, 1973, until May of 1974, when they moved into an apartment.

Plaintiff admitted bringing cereal, bread and flour into the trailer on May 19, 1973. In his deposition, he admitted that he did nothing to exterminate the bugs from the time he moved in until a week to ten days after returning from the honeymoon. On direct examination, plaintiff changed his story and testified that he contacted Tibbs concerning the bugs sometime in June. He further testified that Quik-Kill made four treatments and that these had no effect on the bug population.

Garry Davies, plaintiff's cousin, testified that he often visited plaintiff and his wife at their trailer during the summer of 1973. He first visited them during the last week in May and on that occasion saw hundreds of small, reddish-brown bugs present. He recalled that the bugs were present every time he visited, mostly in the bedroom and living room, and that the numbers increased with each visit. On one occasion, in June of 1973, he observed hundreds of bugs in the insulation in the floor registers. Although the bugs he observed were not flying on his first visit, he testified they were flying in June and were the same bugs he had observed on his first visit.

Defendant's witnesses included Stevenson Moore III, a University of Illinois entomologist, whose testimony, by evidence deposition, was admitted. Dr. Moore indicated his familiarity with insects known as "confused flour beetles" and had never heard of "confused grain beetles." He testified that confused flour beetles are one-sixth of an inch long, reddish-brown in color and feed only on grain products. They are not attracted to wood, metal or plastic products. They lay their eggs in grain-based foods and have a six-week cycle including the egg, larva and pupa stages before reaching adulthood. In answer to a hypothetical question, Dr. Moore indicated that these beetles would not be attracted to a mobile

home until food or attractive items were inside it. He also noted that these beetles do not fly, but are closely related to a similar looking insect, the red flour beetle, which does fly and cannot be distinguished without the aid of a magnifying glass. In his opinion, the "confused flour beetles" could be successfully exterminated professionally by various methods "all the way to the ultimate of tarping over this material and using fumigating material which would give 99.9 kill of all stages, which is very costly and which very few exterminating companies have the expertise * * * or the equipment to do * * *."

Defendant Tibbs testified that plaintiff's trailer was constructed of wood, plastic and metal products. During the setup of the plaintiff's trailer prior to the sale, he observed the inner walls of the unit and saw no insects or eggs in the walls or insulation. In addition, he visited plaintiff's trailer a day or so after plaintiff took possession and fixed a water leak and scratch on the wall. At that time, defendant testified, plaintiff made no complaint about bugs and defendant saw no bugs. Tibbs then stated that plaintiff made no complaint about insects until after returning from the honeymoon. When plaintiff complained to the defendant about them, defendant went to plaintiff's trailer where he says he saw possibly a dozen bugs.

Wilma Tibbs testified that she inspected the trailer sold to plaintiff when it arrived from the manufacturer on May 9, 1973, and saw no insects in it at that time. She admitted being present in the home with plaintiff and his wife on May 12, but denied that she had mentioned anything to them about insects. Her recollection was that plaintiff never complained of insects until one week after returning from the honeymoon. She then visited their trailer, observed bugs flying and crawling, mistook them for gnats and recommended that they spray with "Raid." Plaintiff called her the following day to complain and she recommended that he call a professional exterminator. Plaintiff's first complaint concerning the bugs was registered about three weeks after he purchased the trailer, the first week he was back from the honeymoon.

The last witness for the defense was Charles Ohligschlager, who was employed by Quik-Kill as an exterminator, and made several service calls to plaintiff's trailer. The first was in late July and the others were made on August 2, September 5, September 16 and October 5, 1973. During those visits, he applied residual spray, fogged and fumigated the trailer with Corpicrin which required the trailer to be evacuated for 24 hours. In his opinion, the beetles were all or nearly all dead by October 5 and complete eradication would have been possible had plaintiff not canceled the extermination contract. He admitted that on one occasion he saw two or three hundred bugs in plaintiff's bedroom. Ohligschlager maintained he

was testifying voluntarily, but indicated that he was a business acquaintance of the Tibbs' who would like to help them with the lawsuit. Finally, he flatly contradicted plaintiff's testimony by saying that he was admitted to plaintiff's trailer on October 5 by plaintiff himself, contrary to plaintiff's testimony that any visits by Quik-Kill after September 5 were without his permission.

At the close of the evidence, the trial court found a breach of warranty of fitness for particular purpose. The judge recognized that the critical issue of fact was when the beetles were first brought into the trailer. He decided that the insects were present in the mobile home at the time of purchase, thus rendering defendant responsible for this defective condition. The judge held that the plaintiff had "accepted" the mobile home within the meaning of section 2—606 of the Uniform Commercial Code (Ill. Rev. Stat. 1973, ch. 26, par. 2—606), that he had complied with the necessary elements to revoke his acceptance under section 2—608 (Ill. Rev. Stat. 1973, ch. 26, par. 2—608), and that plaintiff was entitled to the ordinaray buyer's remedy set out in section 2—711 (Ill. Rev. Stat. 1973, ch. 26, par. 2—711), including recovery of the price and consequential damages. Judgment was entered for plaintiff against defendant Tibbs for $10,185 (the purchase price), and $2,686.23 (consequential damages) plus costs of suit.

Our attention is first focused on the issue of whether the trial court's finding of breach of warranty was against the manifest weight of the evidence. Section 2—315 of the Commercial Code (Ill. Rev. Stat. 1973, ch. 26, par. 2—315) provides:

> "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

The trial judge expressly found that (1) defendant Tibbs had reason to know the particular purpose for which the home would be used, *i.e.*, a residence, (2) that the plaintiff relied on defendant's judgment in furnishing a home fit for habitation, and, (3) that Tibbs had done nothing to exclude or modify this statutory warranty of fitness. These three findings establish that, first of all, a section 2—315 warranty arose in the present case. Defendant Tibbs does not question these findings on appeal; hence, we must assume that the warranty arose and consider only the question of whether it was breached.

■■ In a bench trial, it is the trial judge's responsibility to determine the credibility of the witnesses, to weigh the evidence and to make the

necessary determinations of fact. An appellate court will not disturb those determinations unless they are against the manifest weight of the evidence. (*Janssen v. Hook* (1971), 1 Ill. App. 3d 318, 272 N.E.2d 385; *Country Mutual Insurance Co. v. Murray* (1968), 97 Ill. App. 2d 61, 239 N.E.2d 493.) Applying this standard to the present case we find that the trial court's decision was not against the manifest weight of the evidence. Plaintiff and his wife both testified that they first saw the bugs, which they later learned were beetles, present in the mobile home on the day of the sale. In addition, plaintiff's cousin, Garry Davies, testified that the beetles were present every time he visited the trailer during the summer of 1973 beginning with his first visit during the last week of May. The testimony of these three witnesses, if believed, was sufficient to support a finding that the trailer was infested at the time of sale.

Defendant's theory was that plaintiff brought the beetles into the trailer for the first time on May 19 when plaintiff brought the cereal, bread and flour into the trailer. However, this theory is contradicted by the testimony of plaintiff and his wife who testified that the beetles were flying in May. According to Dr. Moore, these beetles have a six-week reproductive cycle. Were the beetles brought into the trailer on May 19, they could not possibly have been flying in May or reproduced quickly enough to account for the "few hundred" of them Garry Davies testified were in the living room and bedroom when he first visited in May. Given conflicting theories of how the beetles entered the trailer, we must give deference to the trial judge's decision which necessarily found the plaintiff's witnesses to be credible. It is unnecessary for plaintiff to prove how the beetles came to infest the mobile home, only that they were present at the time of sale. Plaintiff presented no proof that a defect existed at the time the home left the manufacturer; however, testimony of plaintiff and his wife, if believed, establishes that the beetles were present on the day of the sale.

■■ There is really very little question but that a mobile home infested with beetles in the numbers described by plaintiff and his wife is unfit for use as a residence. Persons of ordinary sensibilities would not want to live under such conditions as were shown to have existed in this mobile home during the summer of 1973. We find, therefore, that the record supports the trial judge's finding of breach of warranty.

Next, we must consider whether plaintiff was entitled to revoke his acceptance under section 2—608 of the Commercial Code (Ill. Rev. Stat. 1973, ch. 26, par. 2—608). The court made a finding that plaintiff had "accepted" the mobile home within the meaning of section 2—606 (Ill. Rev. Stat. 1973, ch. 26, par. 2—606). He also found that plaintiff had given defendant notice of the defect within a reasonable time after its discovery pursuant to section 2—608.

In order to revoke acceptance under section 2—608, the buyer must show that acceptance was excused in one of three ways: (1) he accepted on the reasonable assumption that the seller would eliminate the defect and he has failed to do so; (2) he accepted without discovery of the defect but such failure was caused by the difficulty of discovery; or, (3) he accepted without discovery of the defect and such failure was caused by the seller's assurances that the goods were conforming. The trial judge did not pinpoint which of these excuses on which he felt plaintiff could rely. The order contains no finding on this point; however, the evidence would seem to establish that the presence of the beetles was difficult to discover. Assuming plaintiff's testimony to be correct, that the beetles infested the walls and insulation of the home, then discovery of the defect prior to acceptance would have been difficult.

The trial judge found plaintiff's notification to defendant to have been reasonably prompt after discovery of the defect. Determination of a reasonable time and the adequacy of the notice to the seller are ordinarily questions of fact. (*Boysen v. Antioch Sheet Metal, Inc.* (1974), 16 Ill. App. 3d 331, 306 N.E.2d 69.) Defendant has not contested on appeal the timeliness of plaintiff's notice of revocation of acceptance.

■■ Section 2—608 also mentions that revocation must occur "before any substantial change in condition of the goods which is not caused by their own defects." (Ill. Rev. Stat. 1973, ch. 26, par. 2—608(2).) The record is barren of any proof on this element and the trial court's order contains no mention of it. However, since defendant has not raised the issue, we need not discuss it, and treat it as waived.

■■ The final element of section 2—608 is "substantial impairment in value" of the goods to the buyer. Defendant cites *Reece v. Yeager Ford Sales, Inc.* (1971), 155 W.Va. 461, 184 S.E.2d 727, in support of his argument that the presence of a few beetles was not sufficient to render the trailer uninhabitable. In section 2—608 terminology, this reduces to a claim that there was no substantial impairment in value to the buyer. Defendant's reliance on *Reece,* which relied on a comparison of cost of repair compared to the purchase price, is unfounded. What is critical is *not* the dollar value of repairs but "the effect the impairment has on the user." (*Overland Bond & Investment Corp. v. Howard* (1972), 9 Ill. App. 3d 348, 359, 292 N.E.2d 168, 176; see generally, Note, *Revocation of Acceptance: The Test For Substantial Impairment,* 32 U. Pitt. L. Rev. 439 (1971).) Unlike in *Reece,* remedying the defect here was not a simple repair operation. There was ample evidence that the extermination efforts had been tried and had failed. On several occasions, plaintiff and his wife evacuated the mobile home for 24-hour periods in order for Quik-Kill to fumigate the trailer. Like in *Overland,* where the court said, "[a] buyer need not give up his car for indefinite periods of time to allow

the seller to attempt compliance with the implied warranties" (9 Ill. App. 3d 348, 360, 292 N.E.2d 168, 177), plaintiff here cannot be expected to repeatedly evacuate his home 24 hours at a time, not to mention constantly living with the bugs, in order for the exterminator to proceed with efforts to eliminate the defect in compliance with the implied warranty. We find that the record supports a conclusion that there was "substantial impairment in value" of the mobile home to the buyer which justified plaintiff's revoking his acceptance. We need not play the game of how many bugs warrant revocation of acceptance and how many may only constitute a mere need for an effort at "repair." This record establishes that by any reasonable standard there were more bugs than needed for revocation of acceptance.

■■ Defendant's only argument with respect with respect to damages is that plaintiff failed to mitigate by canceling the extermination contract and refusing to reside elsewhere temporarily until the pests were fully eradicated. This argument does not persuade. Repairing even substantial defects would in most cases result in less damages than revoking acceptance and recovering the price. Defendant's argument would, under the guise of mitigation of damages, usually deny the buyer the remedy of revocation of acceptance and require him to keep goods which were not conforming when delivered and which, in all likelihood, would never have been accepted but for the buyer's inability to discover the defect or his belief that the nonconformity would be cured. Moreover, defendant's argument ignores the fact that, as in the case of an automobile, once a person's faith in such a major investment has been shaken, "The vehicle loses not only its real value in their eyes, but becomes an instrument whose integrity is substantially impaired and whose operation is fraught with apprehension." *Zabriskie Chevrolet, Inc. v. Smith* (1968), 99 N. J. Super. 441, 240 A.2d 195, 205.

For the foregoing reasons, the judgment of the circuit court of Livingston County is affirmed.

Judgment affirmed.

MILLS and HUNT, JJ., concur.