GNP COMMODITIES, INC., Plaintiff-Appellee, *v.* WALSH HEFFERNAN COMPANY *et al.*, Defendants-Appellants.

First District (5th Division)    No. 79-2472

Opinion filed April 24, 1981.

Joseph A. Malek, of Berwyn, for appellants.

Joel J. Bellows and Charles B. Bernstein, both of Bellows & Associates, of Chicago, for appellee.

Mr. PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

Defendants appeal from a judgment for plaintiff, after a jury trial, in an action to recover damages in the sale of nonconforming frozen pork bellies. They contend that (1) the trial court should not have permitted their jury demand prior to the retrial of the case; (2) plaintiff's rejection or revocation of acceptance of the goods did not occur within a reasonable time; (3) plaintiff had no right to revoke acceptance since the value of the goods to plaintiff was not substantially impaired; and (4) the trial court improperly instructed the jury that the sole measure of damages was the return of the purchase price.

The record discloses that plaintiff is a commodity trader, a member of the Chicago Mercantile Exchange (Exchange) and, at the time of the transaction with defendants, a hedger and speculator in frozen pork bellies. Its activities included the purchase and sale of pork bellies (referred to as "actual" or "cash" product) and Exchange traded futures contracts for the purpose of speculating on the difference between the

actual product and the futures market. It accomplished this by a technique called "hedging," which involved the purchase of the actual product and the sale of futures against it.

Myron Rosenthal, president of plaintiff, was responsible for buying the actual product through a public meat broker and selling the corresponding futures contract on the Exchange. He testified that he never bought nondeliverable frozen bellies during the hedging season, which was from November through August, and that bellies frozen after November 1 were important to a hedger such as plaintiff because they afforded the option of delivering the actual product against the futures position.

On March 27, 1974, Rosenthal received a telephone call from Eugene Figurelli, the agent for defendant Walsh Heffernan Company (Walsh), a public meat broker, which in turn was the agent that conducted the transaction for the seller of the bellies, defendant Florence Beef Company (Florence). The meat broker assists potential customers by obtaining offerings of fresh or frozen products from sellers who pay for the broker's services, and he is responsible for obtaining necessary information (including freeze dates) from the seller for the buyer.

In the March 27 telephone call, Figurelli asked Rosenthal if he was interested in purchasing five loads of frozen pork bellies, and Rosenthal replied that he was, depending on the freeze date, price, manufacture and location. Figurelli called back within 20 minutes and reported that the bellies were frozen on February 1, 1974, or later, were priced at 43½ cents per pound, and that the weight met Exchange specifications for delivery. Rosenthal told Figurelli that he would purchase those five loads and asked if Figurelli could obtain five more loads which were more "desirable"; that is, either fresh or frozen within the last 15 days. Figurelli later called Rosenthal and told him that he had five more loads priced at 44 cents per pound which would meet Rosenthal's specifications, and he assured Rosenthal that all 10 loads complied with Exchange requirements for delivery.

It appears from the testimony that a party planning to deliver the actual product as protection against a futures contract deliverable between February and August of a given year must comply with Exchange regulations, the most important of which concerns the freeze date and requires that bellies must have been frozen no earlier than the preceding November 1, or must have been accumulating in the freezer not earlier than October 16 with other product and frozen not earlier than November 1. Freeze dates are significant because after bellies have been in the freezer for several months there is a progressively greater chance of deterioration. Bellies frozen before November 1 are not deliverable against futures short sales starting the following February. To a hedger,

therefore, bellies frozen before November 1 have no value, especially between February and August, and thus there is always a price differential between old and new bellies.

Three or four days after the transaction between Rosenthal and Figurelli, Walsh sent plaintiff written confirmations for each of the 10 loads. These revealed that the seller was defendant Florence and included the weight of each load, the storage locations, and the storage companies' lot numbers, but they did not disclose the dates that the product first went into the freezers. Plaintiff paid a total of $164,368.39 for the 10 loads.

Rosenthal and Figurelli communicated every 5 to 10 days for about six weeks in April and May. When freeze dates were mentioned, Figurelli continually assured Rosenthal, "It's okay, it's just a matter of confirming which dates got on which loads." He did not, however, give Rosenthal the exact freeze dates but said they were February 1, 1974, or later. Rosenthal testified that he had no reason to doubt Figurelli's word since there had been no problems dealing with him in the past.

In late May, Rosenthal requested an inspection by the Exchange so that the bellies could be delivered against a futures contract, if necessary. About June 8 or 9, Rosenthal received the first inspection report from the Exchange for loads one and two. They did not pass inspection, since the bellies had been frozen prior to November 1, 1973, and thus were not deliverable. Plaintiff then tried to return the bellies to defendants, but they refused to cancel the transaction. Eventually it was determined that nine of the 10 loads were frozen before November 1973, and were not deliverable. Plaintiff then sold those nine loads on the open market for 21 cents per pound. The tenth load, which was frozen prior to March 1, 1974, was deliverable and was sold for 45½ cents per pound. Plaintiff's proceeds for the 10 loads came to $87,984.16; storage costs were $5,000.

The record further discloses that loads one and two, which defendants sold to plaintiff, were originally owned by Pacific Trading Company (Pacific), which had inadvertently failed to sell them in 1973 and then sold them on January 4, 1974, through Figurelli to Florence. Two months later, on March 19, defendants sold the first five loads (including the Pacific loads) to Murlas Brothers Commodities (Murlas), also through Figurelli. The confirmations on that sale recited that the bellies were frozen in November 1973 or later, but did not provide all the usual information which Figurelli promised to supply later. Murlas had purchased the five loads for November 1 and later freeze so that the bellies could be deliverable on the Exchange and, when the information was not provided, Murlas returned the five loads to Florence on March 26. They were then sold to plaintiff on March 27 through Figurelli.

Plaintiff sued both defendants, alleging breach of contract, fraud and misrepresentation, wilful and wanton fraud and misrepresentation against

each, and also breach of fiduciary duty against Walsh. A count alleging breach of warranty was dismissed. The jury found both defendants liable and assessed plaintiff's damages in the full amount claimed of $81,384.15. The jury also answered two special interrogatories in the affirmative, finding that defendants either singly or together knowingly misrepresented the age of the meat to plaintiff at the time of the sale and that the agreement between the parties specified that the 10 loads were to have been February 1, 1974, freeze or later.

## OPINION

Defendants initially contend the trial court abused its discretion by permitting plaintiff to file a jury demand following withdrawal by defendants of their jury demand prior to retrial. The case originally commenced as a trial by jury but ended in a mistrial, and, as a retrial began, defendants requested a bench trial. Then, for the first time approximately five years after the action was filed, plaintiff demanded and was granted a jury trial.

Under the Civil Practice Act, a plaintiff is generally required to file a jury demand at the time the action is commenced (Ill. Rev. Stat. 1979, ch. 110, par. 64), but additional time may be granted on good cause shown, in the discretion of the court and on just terms (Ill. Rev. Stat. 1979, ch. 110, par. 59).

The situation here is substantially similar to that in the leading case of *Hernandez v. Power Construction Co.* (1978), 73 Ill. 2d 90, 382 N.E.2d 1201, *aff'g* (1976), 43 Ill. App. 3d 860, 357 N.E.2d 606. There, plaintiff did not initially make a jury demand but, when defendant withdrew its demand four years later immediately before trial, plaintiffs' motion for leave to file a late jury demand was denied. On appeal, this court found, among other things, that the trial court abused its discretion in denying the motion. The supreme court affirmed with reasoning that may be distilled as follows: statutes regulating jury demands are to be liberally construed; good cause must be shown to obtain an extension of time to file a later jury demand; in passing upon such a request, the convenience to the parties and the court and any possible prejudice to the rights of the opposing parties must be considered; and the standard of review on appeal is not whether the appellate court would have allowed the motion but whether the action of the trial court was a reasonable exercise of sound discretion. Also see *Greene v. City of Chicago* (1978), 73 Ill. 2d 100, 382 N.E.2d 1205; *Kren v. Payne* (1980), 81 Ill. App. 3d 283, 401 N.E.2d 19. ■■ We believe here that plaintiff has satisfied the requirement of good cause, as he had lost the opportunity for a speedy adjudication because of defendants' original jury demand, and it would be unfair to deprive plaintiff of the benefits of a jury trial. In *Hernandez v. Power Construc-*

*tion Co.*, the court stated "[t]he [appellate] court pointed out that plaintiff, because of the defendant's jury demand, had already lost the benefit of an early adjudication, and that a denial of the demand would deprive plaintiff of the advantage of a jury trial as well. [Citations.] We agree that this element of unfairness constitutes good cause for granting plaintiff's late jury demand * * *." (73 Ill. 2d 90, 97, 382 N.E.2d 1201, 1204.) Furthermore, it seems clear that the parties and the court were not inconvenienced since the case had already been assigned for a jury trial when defendants withdrew their jury demand and plaintiff made its request. There is also no indication of prejudice, as both parties had anticipated a jury trial from the outset. We are thus of the opinion that the grant of leave to file a late jury demand was a reasonable exercise of the trial court's discretion.

Defendants next contend that plaintiff did not reject the pork bellies or revoke acceptance of them within a reasonable time. They argue that plaintiff's conduct was unreasonable because plaintiff indicated no intention to inspect the goods and because information about their condition was readily available.

The record discloses that plaintiff purchased the bellies at the end of March 1974, but did not inspect them until May of that year. Thereafter, plaintiff notified defendants that the goods were nonconforming and unsuccessfully sought to return them. The jury was instructed as to plaintiff's theories that the goods were rejected within a reasonable time and that acceptance was revoked within a reasonable time after discovery of the nonconformity. The issue that is raised, therefore, is whether plaintiff's conduct was reasonable within the framework of those theories.

The Uniform Commercial Code (the Code) provides generally that an action is to be judged as reasonable depending on the nature, purpose and circumstances of such action (Ill. Rev. Stat. 1979, ch. 26, par. 1—204(2)), and in each case that determination rests with the trier of fact (see *Heller v. Sullivan* (1978), 57 Ill. App. 3d 190, 372 N.E.2d 1036; *Sauers v. Tibbs* (1977), 48 Ill. App. 3d 805, 363 N.E.2d 444; *Boysen v. Antioch Sheet Metal, Inc.* (1974), 16 Ill. App. 3d 331, 306 N.E.2d 69). Consistent with that standard, section 2—602(1) provides in relevant part that "[r]ejection of goods must be within a reasonable time after their delivery or tender." (Ill. Rev. Stat. 1979, ch. 26, par. 2—602(1).) Similarly, section 2—608(2) provides in relevant part:

> "Revocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it and before any substantial change in condition of the goods which is not caused by their own defects. It is not effective until the buyer notifies the seller of it." (Ill. Rev. Stat. 1979, ch. 26, par. 2—608(2).)

It is also well established that a jury's finding will not be disturbed on review unless so unreasonable as to be against the manifest weight of the evidence. (*Russo v. Checker Taxi Co., Inc.* (1978), 67 Ill. App. 3d 379, 385 N.E.2d 33; *Papageorgiou v. F. W. Woolworth Co.* (1978), 66 Ill. App. 3d 873, 383 N.E.2d 1346.) In the case before us, we believe that the finding of liability under either theory is not against the manifest weight of the evidence.

We note that the courts may permit buyers to delay inspection until they are ready to resell or use the goods if there is proof of custom or trade usage. In this regard, section 1—205(2) of the Code provides in relevant part:

> "A usage of trade is any practice or method of dealing having such regularity of observance in a place, vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question." (Ill. Rev. Stat. 1979, ch. 26, par. 1—205(2).)

An example in this regard is *La Villa Fair v. Lewis Carpet Mills, Inc.* (1976), 219 Kan. 395, 548 P.2d 825, where the buyer arranged with the seller to have 21 rolls of carpeting delivered to a warehouse to be stored pending the outcome of a strike affecting the buyer's customer. Evidence was presented of an industrial practice for a wholesaler-retailer not to inspect large orders of carpeting upon delivery and that the carpeting would normally be stored until ready for use rather than to unroll it immediately for inspection of concealed defects. Based upon this practice, the court held that a 9-month delay by plaintiff in bringing defects to the seller's attention was not unreasonable. Similarly, in *La Nasa v. Russell Packing Co.* (7th Cir. 1952), 198 F.2d 992, the buyer purchased lard for its baking business. Although 27 of 80 drums had been used before it was determined that the lard had spoiled, the court permitted the buyer to rescind the contract, holding that the buyer was entitled to rely upon the custom of the baking industry not to test standard baking ingredients before using them and to make refunds for any ingredients which proved defective when used. The common factor in the above cases is that the courts permitted delay in inspection when a course of dealing or usage of trade was established.

■■ From the testimony in the instant case, it appears that no physical transfer of meat occurred, as the delivery was accomplished by documents in the form of written confirmations; that in the meat industry inspection is not made until the buyer is ready to deliver the pork bellies from the warehouse against a short sale futures contract on the Exchange; and that the broker is relied upon for information as to freeze dates. We think this testimony established a trade usage permitting delay of inspection until the buyer is prepared to resell the product, and that this usage

was a relevant consideration in the jury's decision that rejection or revocation of acceptance occurred within a reasonable time.

Concerning the rejection theory, it appears that some two months after the date of purchase, upon learning that loads one and two did not meet Exchange specifications, plaintiff promptly telephoned Walsh and sought to return the bellies. The record discloses no denial by defendants that those goods were nonconforming, that they did not receive prompt notification thereof, or that they refused to give plaintiff satisfaction. In the light thereof and considering the trade usage as set forth above, we believe that the combination of plaintiff's refusal to keep the delivered goods and its notice to defendants that plaintiff would not keep them are ample support for the finding that rejection came within a reasonable time.

The cases cited by defendants do not support their position that rejection was not timely. In *Miron v. Yonkers Raceway, Inc.* (2d Cir. 1968), 400 F.2d 112, the seller sued the buyer of a horse and the raceway which acted as the seller's agent in the auction sale of the horse. It was customary in purchasing a racehorse for the buyer's veterinarian or trainer to examine the horse's legs for fractures, but the buyer did not have the horse examined on the date of sale and testified only that the horse was unsound on the day after. The seller testified that the horse was sound at the time of sale, and it was held that where an injury to a horse's leg could have been discovered by the inspection customarily made at the time of sale, the buyer's attempted rejection 24 hours later was unreasonable. In the instant case, however, there was a usage of the futures trade permitting plaintiff to delay inspection of pork bellies until the date of delivery against a futures contract. *Goodlatte v. Acme Sales Corp.* (1923), 229 Ill. App. 610, cited by defendants, is also distinguishable. There, the goods were delivered at the end of April and defendant did not make payment on the due date of June 1 because it was having " 'a good deal of trouble' " with the goods. (229 Ill. App. 610, 612.) The first notice of nonconformity, however, was not given until June 29 and rejection took place on September 12. The court stated that "[t]here is no reason why the goods could not have been examined shortly after they were received by the defendant. This not having been done, it was in no position to reject them on September 12." (229 Ill. App. 610, 615.) In the present case, by contrast, plaintiff notified Walsh immediately upon learning that the goods were nonconforming rather than waiting 2½ months, as the buyer did in *Goodlatte.*

Contrary to defendants' position, we think that the cases upon which they rely actually stand for the principle that all the circumstances, including the conduct of the parties and what was said, are to be con-

sidered in determining whether the buyer waited an unreasonably long time to reject the goods.

With respect to revocation of acceptance, we initially note that the jury could reasonably have inferred from the facts that the transaction had reached a stage beyond the time for rejection and thus that the goods had been accepted. (See Ill. Rev. Stat. 1979, ch. 26, par. 2—606.) In this regard, the focus of our inquiry is, like that of rejection, whether or not the record supports the finding that revocation occurred in a timely manner. Section 2—608(1)(b) of the Code provides:

"(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

\* \* \*

(b) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances." (Ill. Rev. Stat. 1979, ch. 26, par. 2—608(1)(b).)

Section 2—608(2) provides in relevant part that "[r]evocation of acceptance must occur within a reasonable time after the buyer discovers or should have discovered the ground for it \* \* \*." (Ill. Rev. Stat. 1979, ch. 26, par. 2—608(2).) Thus, the reasonable time for revocation of acceptance may be extended if the defect is difficult to discover or if the seller gives continuous assurances.

The record here indicates that the nonconformity was difficult to discover because the pork bellies were warehoused and because the transaction was completed through written confirmations. Testimony was also introduced that it was not customary for hedgers on the Exchange to inspect an actual product since the broker is responsible for ascertaining freeze dates and, in addition, there was ample evidence that defendants knew plaintiff was a hedger and speculator in frozen pork bellies and purchased actual product as protection against futures positions. Moreover, it appears clear that plaintiff was induced to accept the goods by Figurelli's continuous assurances that the goods met the freeze date specified in the contract. It is also significant that the jury especially found that defendants knowingly misrepresented the age of the bellies, and this is evident from defendants' transaction with Murlas involving five of the 10 loads one week earlier, in which defendant told Murlas that the pre-November 1 freeze date was post-November 1 freeze. Those misrepresentations supported the finding that defendants had engaged in the active concealment from plaintiff of the true freeze dates. We believe also that plaintiff's refusal to keep the goods and his prompt notification to Walsh are equally as important in determining timely revocation of acceptance, as in the case of timely rejection. Taking all of these factors

into consideration, it seems clear that the jury was justified in concluding that the 2-month hiatus between the purchase and revocation of acceptance was reasonable.

■■ Contrary to defendants' position that revocation must take place immediately upon purchase, the case law supports the view that depending on the circumstances several weeks or months may elapse before revocation of acceptance. In *Ed Fine Oldsmobile, Inc. v. Knisley* (Del. Super. 1974), 319 A.2d 33, a buyer purchased an automobile which did not meet his expectations or the dealer's representations. Instead of rejecting the car, the buyer continued to bring it to the dealer who promised to make necessary repairs. The court found that the buyer was persuaded by the seller's assurances to withhold revocation for several months and that, even though the vehicle had been driven over 1500 miles, the buyer had had little opportunity for inspection since the car was frequently being repaired. In that situation, revocation of acceptance was held to be timely.

Similarly, in *Birkner v. Purdon* (1970), 27 Mich. App. 476, 183 N.W.2d 598, the buyer revoked acceptance of Christmas trees within one month. Testimony showed that immediate discovery of defect was difficult because of the time required for the trees to open up after being flattened in transit, and that on several occasions the seller had assured the buyer of the good quality of the trees. The court held that revocation was within a reasonable time. In *Parker v. Johnston* (1968), 244 Ark. 355, 426 S.W.2d 155, the seller fraudulently misrepresented the past profits of a vending machine business and the value of juke boxes, cigarette and pinball machines, which comprised the main assets of the business. The court held that the buyer's right to rescission was not waived by his having made 2 of 36 payments on the principal under the contract before becoming convinced of the misrepresentation. The court stated that inducement to retain the goods because of the seller's assurances may permit revocation of acceptance a substantial time after receipt of the goods.

Having found above that inspection could be delayed by virtue of the trade usage, we see no merit in defendants' contention that changes in the buyer's circumstances relative to market factors is an unfair criterion to determine reasonable time for revocation of acceptance. The record indicates that the futures season terminated with the August delivery month, so that the longest period for buyers to hold goods before having to inspect them would be from November 1, the earliest freeze date, through August. Plaintiff's ordering the inspection in May suggests that it acted consistently with the trade usage and that it recognized the possibility of delivering bellies against a futures contract. As the record also makes clear, defendants were familiar with the practices of the Exchange

and with plaintiff's activities thereon. Therefore, since defendants were aware of these uncertainties occurring in the regular course of business, they cannot assert unfairness.

■■ Defendants further suggest that since plaintiff purchased the goods pursuant to documents of title, it had no right of inspection and thus no right to reject or revoke acceptance. Defendants failed, however, to raise this point either at trial or in their post-trial motion and have thereby waived it on appeal. An issue not raised by appellant at trial cannot be considered for the first time on appeal (*Kravis v. Smith Marine, Inc.* (1975), 60 Ill. 2d 141, 324 N.E.2d 417; *Woman's Athletic Club v. Hulman* (1964), 31 Ill. 2d 449, 202 N.E.2d 528), and an argument not raised by post-trial motion also will not be considered on appeal (*Burgdorff v. International Business Machines Corp.* (1979), 74 Ill. App. 3d 158, 392 N.E.2d 183; *Domena v. Prince* (1977), 52 Ill. App. 3d 462, 367 N.E.2d 717; Ill. Rev. Stat. 1979, ch. 110A, par. 366(b)(2)(iii)).

In any event, although section 2—513(3)(b) of the Code precludes the buyer's inspection of goods before payment therefor (Ill. Rev. Stat. 1979, ch. 26, par. 2—513(3)(b)), it does not foreclose inspection after payment. It has been held that in a sale through documents of title, if goods for which the buyer must pay the purchase price before inspection are nonconforming, the buyer may recover the price he has paid. (*Price v. Neiman Brothers Co.* (1926), 240 Ill. App. 157; also see Ill. Ann. Stat., ch. 26, par. 2—513, Illinois Code Comment, at 409 (Smith-Hurd 1963).) Here, plaintiff made no attempt to inspect the goods prior to payment. The written confirmations were sent three days after the oral agreement was reached, and at that time title to the pork bellies was transferred and payment of the purchase price was made by sight drafts and warehouse receipts. Plaintiff ordered the inspection almost two months later. Therefore, section 2—513(3)(b) is inapplicable.

Finally, in support of their contention that rejection or revocation of acceptance was not timely, defendants make several factual assertions which are unsupported in the record. First, they assert that plaintiff had no desire to inspect the goods because it had entered into a so-called "bastard hedge," whereby nondeliverable pork bellies were purchased to offset a futures trade on the purchaser's books with no intention that the actual product be delivered against a futures trade. However, the jury found that the contract was for deliverable bellies, and defendants do not contest that finding. In addition, there was uncontradicted testimony by Rosenthal that he never bought actual product for a bastard hedge during the hedging season from November through August. Second, defendants assert that plaintiff could have ascertained the freeze dates from the broker, the seller, or the warehouse. The testimony consistently showed, however, that the buyer depends upon the broker to provide such

information, and the jury apparently was so persuaded in finding that defendants had knowingly misrepresented the age of the bellies as post-November 1 freeze or later. Third, defendants assert that a warehouse receipt for one of the loads contained the pre-November 1 freeze date and thereby put plaintiff on notice of the nonconformity. However, there is no indication of such receipt in the record. Fourth, defendants assert that because the written confirmations did not specify a freeze date, they were ambiguous and should have put plaintiff on notice. The record clearly indicates, however, that Figurelli continually assured plaintiff that the freeze dates were in compliance with the contract and, because it was the broker's responsibility to provide that information, the time for putting plaintiff on notice was extended.

Concerning defendants' assertion that plaintiff made a substantial profit on the futures market and thereby failed to act in good faith (see Ill. Rev. Stat. 1979, ch. 26, par. 1—203), we note that defendants did not raise that issue at trial or by post-trial motion and thus have waived it on appeal. Nevertheless, there is no indication in the record that plaintiff knew or suspected that any of the freeze dates were pre-November 1 and merely waited for inspection until the market had dropped. Rather, it appears that plaintiff ordered the inspection in due course in anticipation of possible delivery. Even if plaintiff made a profit on futures contracts for pork bellies, we see no reason why the collateral source rule should not apply to bar defendants from reducing damages by proof that plaintiff has been compensated from a source to which they have not contributed. See *Cereal By-products Co. v. Hall* (1958), 16 Ill. App. 2d 79, 147 N.E.2d 383, *aff'd* (1958), 15 Ill. 2d 313, 155 N.E.2d 14; also see *Hanover Shoe, Inc. v. United Shoe Machinery Corp.* (M.D. Pa. 1965), 245 F. Supp. 258, *aff'd* (1968), 392 U.S. 481, 20 L. Ed. 2d 1231, 88 S. Ct. 2224.

We recognize that rejection and revocation of acceptance were intended by the drafters of the Code to be theoretically distinct concepts. (See Ill. Ann. Stat., ch. 26, par. 2—602, Illinois Code Comment, at 428 (Smith-Hurd 1963).) Our reading of the case law suggests, however, that the courts have not always taken to this dichotomy (see, *e.g., Don's Marine, Inc. v. Haldeman* (Tex. Civ. App. 1977), 557 S.W.2d 826), nor does the instant case present an array of facts which fits neatly within one theory or the other. We think those facts are such that, viewed from one perspective, the jury could reasonably conclude that rejection would be the proper label for plaintiff's actions but, when viewed from another, it would constitute revocation of acceptance. A finding under either of the alternatives would not be contrary to the manifest weight of the evidence.

Defendants next contend that plaintiff was not entitled to revoke acceptance since the pork bellies sold to plaintiff were of sufficiently high quality so as not to be substantially impaired in value. They maintain that

there is no significant difference between a pork belly frozen February 1, 1974—which was what plaintiff ordered—and one frozen before November 1 of the preceding year, and thus they argue that they substantially complied with plaintiff's needs. Plaintiff argues, on the other hand, that it was entitled to revoke acceptance since the bellies were not deliverable against a futures contract—the type most often used in plaintiff's business—and therefore the value of the goods to plaintiff was substantially impaired.

■■ Revocation of acceptance due to substantial impairment is governed by section 2—608(1) of the Code, which provides in relevant part:

> "The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him * * *." (Ill. Rev. Stat. 1979, ch. 26, par. 2—608(1).)

The import of this section depends on the reference "to him," which suggests that impairment is to be measured in terms of the particular needs of the buyer. (See Ill. Ann Stat., ch. 26, par. 2—608, Illinois Commercial Code Comment, at 464 (Smith-Hurd 1963).) Thus, one buyer may find goods to be satisfactory despite minor defects, whereas another buyer because of his particular circumstances would find them unacceptable. In order to revoke acceptance, therefore, the buyer must present objective evidence showing that with respect to his own needs, the value of the goods was substantially impaired (*Sauers v. Tibbs* (1977), 48 Ill. App. 3d 805, 363 N.E.2d 444; *Overland Bond & Investment Corp. v. Howard* (1972), 9 Ill. App. 3d 348, 292 N.E.2d 168; also see *Barrington Homes of Florida, Inc. v. Kelley* (Fla. App. 1975), 320 So. 2d 841) and not merely that he thought or believed the value was impaired (*Hays Merchandise, Inc. v. Dewey* (1970), 78 Wash. 2d 343, 474 P.2d 270). What constitutes substantial impairment is determined by the trier of fact. *Boysen v. Antioch Sheet Metal, Inc.*; *Hays Merchandise, Inc. v. Dewey*; see *Campbell v. Pollack* (1966), 101 R.I. 223, 221 A.2d 615; *Rozmus v. Thompson's Lincoln-Mercury Co.* (1966), 209 Pa. Super. 120, 224 A.2d 782.

We think it clear from the record here that plaintiff wanted bellies deliverable against a futures contract and planned to resell them on the market; that there was a price differential between deliverable and nondeliverable product caused by the decline in value in direct proportion to age; and that nine of the loads were so old as to be nondeliverable. Additionally, it is implicit in its verdict that the jury found the price differential between deliverable and nondeliverable bellies to have substantially impaired the value of the merchandise to plaintiff, and we do not believe this finding was against the manifest weight of the evidence.

The question of substantial impairment has been considered by several courts. In *Sauers v. Tibbs*, plaintiff revoked acceptance of a

mobile home which was infested with beetles. The court stated that with respect to revocation, the effect of impairment on the user and not the dollar value of repairs is crucial in establishing substantial impairment. In *Stamm v. Wilder Travel Trailers* (1976), 44 Ill. App. 3d 530, 358 N.E.2d 382, plaintiff complained of a number of minor defects in the new trailer he purchased, but presented no evidence as to costs of repairs. There was defense testimony that the defects could be repaired in one hour at a cost of $10, and that plaintiff brought the trailer in for repairs but when he was told that a couple of days would be needed to do the work, he left and did not return. It appears that plaintiff took a trip with the trailer despite the defects. Finding the defects to have minimal impact on plaintiff, the court held that substantial impairment had not been proved. In *Overland Bond & Investment Co. v. Howard*, the buyer told the seller he was a salesman and needed his car daily. On the first day the buyer used the car, the transmission fell out and it took nine days to repair. Then the gas line clogged and the brakes failed, requiring more repairs, but the seller did nothing for three weeks despite telling the buyer the repairs would be made. Finding that the car was so hazardous to drive that its value to the buyer was substantially impaired, the court held that revocation of acceptance was justified. In the light of the foregoing, we believe that plaintiff here has presented sufficient objective facts showing substantial impairment in the value of the goods to him.

Defendants' final contention is that as several theories of liability were advanced, the trial court erred by instructing the jury that the proper measure of damages was the difference between the purchase price and the amount paid to plaintiff for resale of the goods plus storage costs. Plaintiff maintains that each theory upon which liability is predicated permits recovery of the purchase price. Count I alleged that the goods were nonconforming and that plaintiff was entitled to reject them. Counts II and VI alleged that defendants were guilty of fraudulent misrepresentation. Count III alleged breach of contract. Count IV charged defendant Walsh with breach of fiduciary duty. Count VII, in repeating Count VI, also alleged wilful and wanton conduct by defendants.

The trial court instructed the jury as follows:

"If you decide for the plaintiff on the question of liability, you must then fix the amount of damages to which the plaintiff is entitled, which you are hereby directed to fix as the difference between the purchase price and the amount for which the plaintiff sold the goods plus storage charges you find the plaintiff incurred."

Defendants urge, however, that the trial court should have instructed the jury on the measure of damages in accordance with section 2—714(1) of the Code, which provides:

"Where the buyer has accepted goods and given notification

(subsection (3) of Section 2—607) he may recover as damages for any non-conformity of tender the loss resulting in the ordinary course of events from the seller's breach as determined in any manner which is reasonable." Ill. Rev. Stat. 1979, ch. 26, par. 2—714(1).

Defendants' position lacks merit for several reasons. First of all, the record does not indicate that an instruction as to section 2—714(1) was tendered. If a party does not tender an instruction, the trial court's failure to give it cannot be claimed as error on appeal. (Ill. Rev. Stat. 1979, ch. 110A, par. 366(b)(2)(i).) Second, defendants have referred us to nothing in the record which would support giving an instruction under section 2—714(1). Unless the record includes some evidence to support the theory set out in a tendered instruction, the trial court is not required to give it. (*Figarelli v. Ihde* (1976), 39 Ill. App. 3d 1023, 351 N.E.2d 624; *Biggerstaff v. New York, Chicago & St. Louis R. Co.* (1957), 13 Ill. App. 2d 85, 141 N.E.2d 72.) Third, it is apparent that section 2—714(1) applies after the time for rejection and revocation of acceptance has passed (Ill. Ann. Stat., ch. 26, par. 2—714, Illinois Commercial Code Comment, at 574 (Smith-Hurd 1963)), and defendants have failed to show that such was the fact here. We find, therefore, that section 2—714(1) is inapplicable, and the trial court was not required to give such instruction.

■■ Moreover, by their failure to object to the damages instruction at the instructions conference, defendants have waived any right to raise that issue on appeal. *Saunders v. Schultz* (1960), 20 Ill. 2d 301, 170 N.E.2d 163; *Onderisin v. Elgin, Joliet & Eastern Ry. Co.* (1959), 20 Ill. App. 2d 73, 155 N.E.2d 338.

In any event, the instruction that the trial court gave was not inconsistent with section 2—714(1). Section 1—106(1) of the Code provides that remedies are to be liberally administered to the end that the aggrieved party may be placed in as good a position as if the other party had fully performed (Ill. Rev. Stat. 1979, ch. 26, par. 1—106(1); see *McGrady v. Chrysler Motors Corp.* (1977), 46 Ill. App. 3d 136, 360 N.E.2d 818) and, in view of this Code policy, we believe the manner in which damages were assessed in the instant case was reasonable. We note in addition that, contrary to defendants' assertion, the damage instruction did not assume as true any version of disputed facts which the jury should be expected to resolve. Rather, the instruction stated that the fixing of damages was conditioned by the finding of liability. *Cf. Pioneer Hi-Bred Corn Co. v. Northern Illinois Gas Co.* (1975), 61 Ill. 2d 6, 329 N.E.2d 228.

With respect to rightful rejection (Ill. Rev. Stat. 1979, ch. 26, par. 2—602) and justifiable revocation of acceptance (Ill. Rev. Stat. 1979, ch. 26, par. 2—608), the buyer's remedies are governed by section 2—711 of the Code, which provides in relevant part:

"(1) Where * * * the buyer rightfully rejects or justifiably re-

vokes acceptance then with respect to any goods involved, * * * the buyer may cancel * * *.
* * *

(3) On rightful rejection or justifiable revocation of acceptance a buyer has a security interest in goods in his possession or control for any payments made on their price and any expenses reasonably incurred in their inspection, receipt, transportation, care and custody and may hold such goods and resell them in like manner as an aggrieved seller (Section 2—706)." (Ill. Rev. Stat. 1979, ch. 26, par. 2—711(1), (3).)

The aggrieved seller's right to resell is governed by section 2—706(1), which provides in relevant part:

"Where the resale is made in good faith and in a commercially reasonable manner the seller may recover the difference between the resale price and the contract price together with any incidental damages allowed under the provisions of this Article (Section 2—710), but less expenses saved in consequence of the buyer's breach." Ill. Rev. Stat. 1979, ch. 26, par. 2—706(1).

Consistent with these Code provisions, it is our view here that plaintiff rightfully rejected or justifiably revoked acceptance and notified defendants in a timely manner that it was cancelling the contract. Also, since possession or control passed to plaintiff through the documentary sale, plaintiff had a security interest in the goods for payments made on the purchase price and any reasonably incurred expenses including care and custody of the goods. The record does not reveal and defendants give no indication that plaintiff did not sell the goods in a commercially reasonable manner. To the contrary, there was testimony that the price received for the nine nondeliverable loads was the best plaintiff could get, and it sought to recover the difference between the contract price and the resale price, together with incidental damages in the form of storage costs. (*Cf. American Paper & Pulp Co. v. Denenberg* (3d Cir. 1956), 233 F.2d 610.) Under section 2—710 of the Code, incidental damages includes expenses for care and custody of the goods. (Also see *Durfee v. Rod Baxter Imports, Inc.* (Minn. 1978), 262 N.W.2d 349; *Welken v. Conley* (N.D. 1977), 252 N.W.2d 311; *Mobile Home Sales Management, Inc. v. Brown* (1977), 115 Ariz. 11, 562 P.2d 1378.) We believe, therefore, that the measure of damages instruction comports with the Code requirements. Also, inasmuch as the contract in question involved the sale of goods, damages for the breach thereof are governed by the Code, so that we need not consider the question of damages for breach of contract under the common law.

Concerning damages where fraud is involved, the Code permits an aggrieved buyer to cancel the contract and recover the purchase price. Section 2—721 provides:

"Remedies for material misrepresentation or fraud include all remedies available under this Article for non-fraudulent breach." (Ill. Rev. Stat. 1979, ch. 26, par. 2—721.) Under sections 2—711(1)(3), 2—706(1), and 2—710, cancellation of the contract and recovery of the purchase price less proceeds from the resale plus storage costs are available as the measure of damages for fraud. (See *Calloway v. Manion* (5th Cir. 1978), 572 F.2d 1033; *Lanners v. Whitney* (1967), 247 Ore. 223, 428 P.2d 398; Ill. Ann. Stat., ch. 26, par. 2—721, Illinois Code Comment, at 605-06 (Smith-Hurd 1963).) The damages instruction is therefore consistent.

Additionally, the Code does not supersede the common law right of an aggrieved buyer in an action for fraud to rescind the contract and recover the purchase price. Although the Code abandons the concept of rescission for those of rejection and revocation (*Calloway v. Manion*; *Lawner v. Engelbach* (1969), 433 Pa. 311, 249 A.2d 295), it has been held that an action for fraud is still available outside the Code (*Calloway v. Manion*; *City Dodge, Inc. v. Gardner* (1974), 232 Ga. 766, 208 S.E.2d 794; see Ill. Rev. Stat. 1979, ch. 26, par. 1—103). One remedy generally available to the defrauded party is to elect to repudiate the transaction and be placed in status quo. (*Walsh v. Oberlin* (1971), 2 Ill. App. 3d 987, 276 N.E.2d 728; *Meneghin v. Thunander* (1962), 36 Ill. App. 2d 452, 184 N.E.2d 753.) Hence, in the present case, plaintiff would be properly compensated through the damages formula ordered by the trial court, that is, by repudiating the contract and recovering the consideration given less proceeds from the resale plus storage costs. See *Hey v. Duncan* (7th Cir. 1926), 13 F.2d 794; *Johnston v. Shockey* (1929), 335 Ill. 363, 167 N.E. 54.

■■ Finally, the measure of damages for breach of fiduciary duty, like that in an action for fraud, entitles the purchaser to recover the purchase price. It is well settled that transactions of parties standing in a fiduciary relationship will be set aside where reasonable suspicion exists that the confidence had been abused. (*Moehling v. W. E. O'Neil Construction Co.* (1960), 20 Ill. 2d 255, 170 N.E.2d 100; *Lerk v. McCabe* (1932), 349 Ill. 348, 182 N.E. 388; *Spindler v. Krieger* (1958), 16 Ill. App. 2d 131, 147 N.E.2d 457.) Thus, it would appear that the contract between plaintiff and defendants was voidable and plaintiff was entitled to be placed in the position it occupied prior to the transaction. We hold, therefore, that the trial court's instruction on damages was not in error.

For the reasons stated, the judgment and the award of damages are affirmed.

Affirmed.

LORENZ and WILSON, JJ., concur.