WALLACE C. REVAK, Plaintiff-Appellee, *v.* THE VILLAGE OF HANOVER PARK, Defendant-Appellant.

First District (5th Division)    No. 77-123

Opinion filed December 22, 1978.

Klohr, Braun, Lynch & Smith, of Chicago (John J. Treacy, of counsel), for appellant.

Barclay, Damisch & Sinson, Ltd., of Chicago (Sidney Z. Karasik, of counsel), for appellee.

Mr. JUSTICE WILSON delivered the opinion of the court:

This appeal arises out of a jury's award of damages to plaintiff in an action for negligence against defendant. Defendant raises a number of issues, but we need not consider all of them because we find one issue dispositive. We reverse and remand for a new trial on grounds that the trial court erred in directing a verdict on the issue of negligence.

Unless otherwise indicated, the following facts come from plaintiff's testimony. At about 10:15 a.m. on September 25, 1973, plaintiff, Wallace

Revak, an employee of a scavenger service, arrived at the Village of Hanover Park (Village) municipal building to make his last commercial pickup of the day. Plaintiff's partner, John Magget, was also present at the time. As plaintiff backed his truck into a "leach box" or garbage container, he noticed 20 to 25 five-gallon cans in the area of the leach box. Some of the cans were labelled "poison." Plaintiff said that it was not his custom to read the labels. Since some of the cans were resting against the leach box, he and Magget had to move the cans in order to get to the box. They threw six to eight of the cans into the truck. Also, when they emptied the leach box into the truck, they noticed another one of the cans in the box. Plaintiff testified that it was his habit not only to empty the leach box but to pick up anything in the area of the leach box and throw it into the truck. He said that he had done so for seven years. He also said that there were no warnings of any kind posted in the area of the leach box. On cross-examination, he testified that he was aware of the dangers in his line of work and that he did not always "scoop up" everything he saw.

After they had thrown all the garbage into the truck, a blade in the truck pushed all of the garbage into a separate container. When the blade returned, it splashed a puddle of red colored water which had accumulated in the truck's hopper and some of the substance splashed onto plaintiff's hand. Plaintiff testified that although he was wearing gloves, the substance soaked through and caused a burning sensation in his hands.

Plaintiff testified that about five minutes after they had arrived and immediately after they had returned the leach box to its proper place, Anthony Bursha, a foreman with the water and sewer section of the Village, came out and told plaintiff that he did not want the cans picked up by the scavenger service. Plaintiff, who was angry with Bursha for saying this, told him that he was a little late in making his announcement. Bursha then told plaintiff that he had called the garbage dump the day before and that they had refused to take the cans. He told plaintiff that the substance contained in the cans was used to clean out sewers and that it was very flammable and potent and could cause burns if one were to come into contact with it. Plaintiff stopped loading the cans after this warning. After Bursha had left, three employees of the Village came out and one told plaintiff that the substance contained in the cans was "pretty hot stuff." Plaintiff told him that since the cans were already in the truck, he could not do anything about it. Plaintiff then left the municipal building and went to meet another truck which was working the residential areas of the Village.

Anthony Bursha, a section 60 witness called by plaintiff, testified that the cans had been stored a couple of feet away from the leach box. He said that they had been stored there because the Village was going to bury

the cans in a field. The cans were eventually buried two or three days later. Bursha said that he first spoke to plaintiff seven minutes after he had seen plaintiff arrive in his scavenger truck. He said that he ran to plaintiff and told him that he hoped that he had not dumped any of the cans. He told plaintiff that when the powder in the cans was mixed with water, it would smoke. He also told him that there was a danger in mixing the chemical with gasoline rags and water. After these warnings, he told plaintiff to get the cans out of the truck. When plaintiff refused, Bursha told him that "it is bad stuff when mixed with water." Nevertheless, plaintiff said, "You have a fire department, haven't you," and then he left.

After plaintiff had travelled about a quarter of a mile, he heard a hissing sound coming from the back of the truck. He said that it sounded like a "bunch of cats in a closed area." After about 30 seconds, there was an explosion. Despite the explosion, plaintiff kept driving the truck, flashing his lights and sounding his horn as he sped down the highway. He said that he could see smoke and flames coming from the rear of the truck and he headed in the direction of a fire station. When he arrived at the station, the fire was eventually extinguished. Plaintiff testified that while he was driving to the fire station, he was not injured but he felt very upset and was afraid of involving other motorists in his troubles.

William Gresher, chief of the Village Fire Department, testified as plaintiff's section 60 witness. He stated that at approximately 10:40 a.m. on September 25, 1973, he directed the extinguishment of a fire in a garbage truck. He stated that when he first saw the truck, smoke was coming from the back end. In his report, he indicated that the cause of the fire was chemical in origin.

When the fire had been extinguished, plaintiff drove the truck over to the residential area where his foreman, Johnny White, was working. Later that day, White drove plaintiff home. Plaintiff testified that during the ride home, he felt "very upset and very uptight." He said that he had never felt those emotions before. When he arrived home, his wife decided to take him to see their family doctor, Dr. Jamison.

Plaintiff testified that Jamison treated his arm with salve and ointment and told him that he had second degree burns. Plaintiff said that he felt very nervous while he was in the doctor's office. The next day he returned to work, but two days later he returned to see Jamison. He stated that after the incident he was feeling very nervous and emotionally upset because of the incident. He began losing weight. He could no longer get along with those around him and he was having problems sleeping. He testified that he began screaming and crying when he was upset. Also, he stated that he had developed a bad attitude towards the Village on account of what had happened.

Dr. Dan D. Jamison testified that he had first treated plaintiff for

convulsions in February of 1973. He next saw plaintiff in May and prescribed some medicine for the convulsions. On September 25, he treated plaintiff for the injuries to his hands. On September 28, he said that plaintiff returned and his hands seemed cured. However, he noted that plaintiff appeared to be "unduly disturbed about the incident, and * * * he mentioned seeing a lawyer." When asked on cross-examination whether the cause of plaintiff's ill being was that he spilt the chemical on his hands, he testified that it was.

The week after plaintiff had last seen Jamison, he went to see Dr. Clapman, a skin specialist. He testified that the reason that he went to Clapman was because he wanted to make sure that there were no cancerous materials in his hands. He saw Clapman three times in the month of October.

In December, plaintiff went to see Dr. Ronald Shlensky, a physician-psychiatrist. He went to see Shlensky because all of the conditions previously described were getting progressively worse. He said that he was developing a very dark attitude of life. He also said that he felt that "everything was closed in around" him. Shlensky recommended that he go immediately into a hospital. However, he did not enter a hospital because he was afraid of losing his job.

Dr. Shlensky testified that plaintiff's attorney had referred plaintiff to him. He said that plaintiff told him that he had suicidal feelings. Plaintiff also told him about the previously described conditions. Shlensky diagnosed these conditions as traumatic neurosis and psychotic depressive reaction and stated that plaintiff was in need of immediate hospitalization. He explained that traumatic neurosis was an illness which begins when there is some traumatic event which somehow reaches every element of a person's state of mind. He stated that an explosion was an example of such a traumatic event. He explained psychotic depressive reaction by saying that it is a depression in which there is a diversion from reality and certain vegetative signs. He stated that this illness is manifested in some cases by an individual thinking that he has cancer inside of him that nobody has discovered. Shlensky said that it was his opinion that both of these conditions were related to the explosion. He also said that plaintiff would not have developed the traumatic neurosis without the explosion.

Shlensky further testified that he did not think that plaintiff's prior convulsions caused the depression. He noted that convulsions often cured depression. Additionally, he stated that he did not feel that other stressful circumstances in plaintiff's life precipitated the illnesses. In particular, he did not feel that the fact that plaintiff's father had a tumor and had to undergo brain surgery twice, that his mother suffered from cancer, that his wife had been institutionalized for an emotional breakdown, and that

his son had an extreme asthmatic condition precipitated the illnesses. On cross-examination, he stated that the tendency to bring a lawsuit in hopes of getting money was often a secondary gain of an illness. However, he said that secondary gain is not conscious and that he felt that plaintiff's illness was legitimate.

In August of 1974, plaintiff moved to Tucson Arizona because he felt that the climate would be better for his asthmatic son. He had a number of low paying jobs while there, but he could not keep any of them because he had problems getting along with the personnel. He said that he was still experiencing his depression and fright while he was living in Tucson. He was receiving treatment for the depression as an outpatient at the Tucson East Mental Health Center. Eventually, he left Tucson and moved to Las Vegas, Nevada.

Plaintiff testified that he was presently experiencing the same types of problems as before. Additionally, he stated that he no longer did things with his children. He had formerly taught them a number of sports, but he was now unable to teach them anymore because of his feelings of sadness and depression.

Defendant's witnesses testified about another incident. involving plaintiff. Plaintiff, called as defendant's section 60 witness, and John White each testified that they were working together in a residential area when an explosion occurred in John White's garbage truck. Plaintiff immediately changed his testimony and said that it was a fire, and not an explosion, and that the incident occurred approximately one month after the September 25 explosion. Furthermore, he stated that he was only involved in one explosion. White testified that he could not remember exactly when the explosion had occurred but he knew that it was in 1973 and that it was not the same explosion as the one in which plaintiff was involved in on another occasion.

Edward Hurzog, a captain in the Village Fire Department, testified that on October 30, 1973, he was standing in his front yard when, looking north, he saw smoke coming from a garbage truck. He told his wife to notify the fire department and then he went directly over to the garbage truck. He said that from the condition of the truck, it looked like an explosion had occurred. He saw both plaintiff and a man named John at the scene.

Fire Chief Gresher testified that he was called to put out a fire on a disposal truck on October 30, 1973. He said that he saw plaintiff at the scene and that both plaintiff and White told him that there had been an explosion. Gresher's report of the fire confirmed that there had been an explosion.

Raul Hill, a patrolman for the Village, testified that at 2:20 p.m. on October 30, 1973, he investigated a garbage truck fire. He said that both .

plaintiff and White were present. Plaintiff told Hill that he and White had thrown a can marked "[h]ighly combustible, do not mix with water" into the garbage truck a short time before the explosion. Plaintiff also told Hill that he and White had opened the can before throwing it into the truck and had not discovered anything harmful. Hill said that both plaintiff and White appeared to be visibly upset over the incident.

OPINION

At the close of all the evidence, plaintiff moved the court to direct a verdict on issues of negligence and contributory negligence. The court granted the motion on the issue of negligence but denied the motion on the issue of contributory negligence. In instructing the jury on this ruling, the court stated:

"The jury is instructed that the court, as a matter of law, has found the defendant guilty of negligence."

Defendant contends that the trial court erred in directing a verdict on the issue of negligence and argues that this issue should have been left to the jury. We agree.

In granting a motion for a directed verdict on the issue of negligence, the trial court must determine that "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14.) We find that measuring the evidence in this case by this standard the motion for a directed verdict should not have been granted.

■■ To prove negligence, a plaintiff must show (1) that defendant owed him a duty, (2) that defendant breached that duty, and (3) that defendant's breach was the proximate cause of a compensable injury to plaintiff. (*Century Display Manufacturing Corp. v. D. R. Wager Construction Co.* (1977), 46 Ill. App. 3d 643, 649, 360 N.E.2d 1346, 1351; *Rios v. Sifuentes* (1976), 38 Ill. App. 3d 128, 130, 347 N.E.2d 337, 339.) Plaintiff contends that defendant breached the duty of due care which it owed plaintiff by placing the cans of highly caustic and explosive sewer solvent close to the leach box without any satisfactory warning of its dangerous propensities. He states that the labels which were on some of the cans were not adequate warnings because they only referred to the fact that the contents of the cans were poisonous.

■■ Defendant contends that it exercised due care in giving sufficient warning to plaintiff. In addition to the labels, warnings were provided by two of defendant's employees. Anthony Bursha, a foreman with the water and sewer section of the Village, testified that seven minutes after plaintiff had arrived to make his pickup, he ran out to plaintiff and told him that he

hoped that plaintiff did not throw any of the cans into the truck. He stated that the substance contained in the cans was used to clean out sewers and that it was very flammable and potent. He also told plaintiff to get the cans out of the truck, and when plaintiff refused, he warned him that "it is bad stuff when mixed with water." After Bursha had left, another employee of the Village told plaintiff that the substance in the cans was "pretty hot stuff." We find that these warnings were sufficient evidence of the exercise of due care by defendant so that the jury should have been permitted to decide the issue of negligence.

Furthermore, assuming *arguendo* that plaintiff had satisfactorily established defendant's breach of duty, we do not find that the evidence at trial establishes the element of proximate cause so that "no contrary verdict based on that evidence could ever stand." Although Dr. Shlensky testified that the September 25 explosion precipitated plaintiff's illnesses, there is no evidence that he was aware of the October 30 explosion. That explosion was confirmed by a number of defendant's witnesses, some of whom stated that plaintiff had told them about the explosion. Plaintiff himself acknowledged the October 30 explosion, although he later retracted that statement. It is at least conceivable that plaintiff's illnesses could have been caused by the later explosion. We think that this evidence raises enough of a question of fact to withstand a motion for a directed verdict.

■■ Although not necessary for our disposition in this case, we also find that the trial court erred in its instruction to the jury on the issue of negligence. Generally, "[i]nstructions are to be considered as a whole and a deficiency in one instruction may be cured by another." (*Wood v. Mobile Chemical Co.* (1977), 50 Ill. App. 3d 465, 475, 365 N.E.2d 1087, 1094. See also *Perry v. Chicago & North Western Transportation Co.* (1977), 54 Ill. App. 3d 82, 369 N.E.2d 155; *Cole v. Brundage* (1976), 36 Ill. App. 3d 782, 344 N.E.2d 583.) However, if an instruction is peremptory in character, any deficiency in it may not be cured by another instruction. (*Duffy v. Cortesi* (1954), 2 Ill. 2d 511, 119 N.E.2d 241; *Dziewatkowski v. City of Chicago* (1969), 109 Ill. App. 2d 405, 248 N.E.2d 734.) A peremptory instruction is " 'an instruction given by a court to a jury, which the latter must obey implicitly, as an instruction to return a verdict for the defendant, or for the plaintiff, as the case may be'." (*Martin v. Kralis Poultry Co.* (1973), 12 Ill. App. 3d 453, 466-67, 297 N.E.2d 610, 620.) Where it is shown that the court has erred in giving such an instruction, a reversal is required unless the record shows that the error was not prejudicial. *Duffy v. Cortesi* (1954), 2 Ill. 2d 511, 119 N.E.2d 241.

■■ We believe that the instruction in this case was peremptory because it carried with it the necessary implication that the jury should find for plaintiff on the question of liability. In particular, we note the court's use

of the phrase, "guilty of negligence," in the instruction. Practically speaking, this phrase is capable of misleading the jurors into believing that legal liability has been determined and that the sole issue for them to decide is the issue of damages. Considering the fact that an issue was raised as to plaintiff's contributory negligence, we believe that the jury may have been misled by this instruction into thinking that they were not to consider this issue. As a result, we believe that defendant was prejudiced by this instruction.

For the foregoing reasons, we reverse and remand to the trial court for a new trial.

Reversed and remanded.

SULLIVAN, P. J., and LORENZ, J., concur.