ALDEN PRESS, INC., Plaintiff-Appellee, v. BLOCK AND COMPANY, INC., Defendant-Appellant.

First District (3rd Division)   No. 86—3313

Opinion filed July 20, 1988.

252

254

Hinshaw, Culbertson, Moelmann, Hoban & Fuller, of Chicago (Robert E. Nord, Mark M. Christerson, and Kathryn A. Spalding, of counsel), for appellant.

Altheimer & Gray, of Chicago (Roger B. Harris and Judy L. Smith, of counsel), for appellee.

JUSTICE FREEMAN delivered the opinion of the court:

Plaintiff, Alden Press Inc., sued defendant, Block and Company, Inc., for breach of contract. The jury returned a verdict for plaintiff for the total amount allegedly due under the contract, $66,389.16. The trial court also awarded plaintiff costs, prejudgment and post-judgment interest. Defendant appeals from the judgment for plaintiff.

Defendant is a mail order company which sells it goods through catalogs. Plaintiff is a printer. In February 1981, defendant contracted with plaintiff for, *inter alia*, the printing and mailing of

100,000 copies of a bank and cashier equipment catalog, No. 2381. Plaintiff contracted to "saddle stitch" the catalogs "with 3 wires." This meant that three staples would be used to hold the catalogs together. It also agreed to "trim" the catalogs "flush to size." This meant that the catalogs' covers would be the same size as their pages. The original quantity of 100,000 was later increased to 125,000. Under the contract, the catalogs were to be mailed to defendant's customers over a six-month period beginning on April 1, 1981. After completion of the printing, plaintiff delivered a carton of 50 of the catalogs to defendant on March 30. Plaintiff mailed 17,888 catalogs on the 31st and delivered an additional 3,120 catalogs to defendant for use by its telemarketing personnel and to be sent to customers. Defendant held the remaining catalogs in its inventory awaiting further instructions from defendant.

Mitchell Block, defendant's president, and Dick Hane, its vice-president of purchasing in 1981, discovered in late March or early April 1981 that the covers of the catalogs were falling off. Block testified that the problem was significant because the mailing labels were attached to the back covers and if the covers fell off the catalogs would be undeliverable.

After being notified by Hane, Dick Scher, plaintiff's salesman in charge of defendant's account, inspected the catalogs with Hane. Scher took some of the catalogs back to plaintiff's plant and showed them to Don Carlson, plaintiff's vice-president of field sales. According to Scher, plaintiff agreed to remedy the problem with the catalogs by reprinting the covers, tearing the old covers off and rebinding the new covers to the existing 96-page catalog bodies.

Thereafter, Dick Hane testified, at a meeting of representatives of both parties, Mitchell Block told plaintiff's representatives that the catalogs were unacceptable and that he wanted a reprint. In response, Scher proposed that the catalogs be put in plastic bags and the mailing labels attached to the bags. That solution was unacceptable to Block. Scher next proposed that the catalog covers be reprinted and rebound to the catalogs. Scher displayed two sample catalogs with white covers "saddle stitched" with two additional staples, for a total of five, and "trimmed flush" with the catalog pages. Mitchell Block approved this solution on the condition that defendant be allowed to review the rebound catalogs before they were mailed by plaintiff.

Thereafter, plaintiff had the catalogs rebound by Frank's Bindery at plaintiff's expense. On April 27, 1981, plaintiff received 50 rebound catalogs from Frank's Bindery which it sent to defendant. A meeting was then held at Mitchell Block's request at which he told Scher and

Carlson that he was unhappy with the rebound catalogs but would abide by the decision of his staff. A day or so later, Scher and Hane inspected the rebound catalogs at plaintiff's plant. Scher testified that Hane was satisfied that the catalogs would travel through the mail but reserved final approval of the catalogs until he got back to his office. Thereafter, Hane called Scher and told him that defendant wanted the entire catalog reprinted.

Defendant found the catalogs unacceptable because, *inter alia*, the covers overlapped the catalog pages rather than being trimmed flush to the pages. As a result, an attempt to open the catalogs would cause them to open at the middle, where the order form was located. Concomitantly, the first 20 pages of the catalog, where the products accounting for 70% of defendant's sales were located, would be bypassed. Defendant felt that this would inhibit impulse purchases of its high volume items.

Notwithstanding defendant's dissatisfaction with the catalogs, it instructed plaintiff to proceed with the second mailing, of 19,379 catalogs, on or about April 30. Mitchell Block testified that he approved the second mailing because he "had no choice" and because a failure to mail any catalogs would have "spelled financial disaster" for defendant. Block also testified that he thereafter called plaintiff's president twice but was unsuccessful in reaching him. Dick Hane testified that he too attempted to reach plaintiff's president but was unsuccessful. Thereafter, Hane contacted Scher, informed him the catalogs were unacceptable and requested that the catalogs be reprinted. Don Carlson telephoned Dick Hane and informed him that plaintiff would not reprint the catalogs. At Carlson's request, Hane wrote a letter to plaintiff, dated May 1, rejecting the catalogs. On May 5, defendant ordered 2,000 catalogs from plaintiff for office use. Finally, defendant had 80,000 catalogs printed by a second printer. Defendant never paid plaintiff for any of the 125,000 catalogs it printed.

OPINION

Defendant first contends that the trial court erred in denying its motion for judgment notwithstanding the verdict because the evidence established that it had not accepted all of the catalogs. Plaintiff asserts that defendant waived this issue. During its deliberations, the jury asked the trial court what the governing law was if it chose not to award "the entire amount" to either party. Plaintiff notes that defendant did not object to the trial court's answer that the jury had been given the instructions on the law. It also notes that defendant did not propose at that time or earlier that the jury be instructed that

it could decide the case on less than an "all or nothing basis." As a result, plaintiff concludes, defendant waived its right to complain that the trial court did not instruct the jury that defendant accepted only some of the catalogs.

■ Defendant's failure to object to the instruction given in response to the jury's inquiry did not result in a waiver of the error alleged. (See *Darda v. Chicago Transit Authority* (1968), 100 Ill. App. 2d 94, 100, 241 N.E.2d 478 (inquiry on motions for directed verdict and judgment *n.o.v.* assumes that determination will be made in light of correct and applicable law and motion for judgment *n.o.v.* is and must be decided without consideration of argument to jury, instructions or the verdict, which occur after presentation of the evidence).) Rather, the test of waiver of such argument is whether it was presented to the trial court. Here, defendant undeniably argued below that it was entitled to judgment *n.o.v.* in part because it had not accepted all of the catalogs. It thus properly preserved the issue for purposes of appeal.

Defendant asserts that it was entitled to a judgment *n.o.v.* because the evidence revealed that the catalogs were defective and that defendant never accepted them. Alternatively, defendant asserts the trial court should have: (1) directed a finding that defendant did not accept the catalogs which it did not instruct plaintiff to mail or otherwise use in any manner and (2) reduced the verdict accordingly; or (3) granted a new trial to determine the reasonable value of the catalogs defendant did accept. Defendant asserts that its rejection of the catalogs remaining in plaintiff's possession complied with the requirements of the Uniform Commercial Code—Sales (the Code) (Ill. Rev. Stat. 1981, ch. 26, par. 2—201 *et seq.*).

Plaintiff asserts there was substantial evidence from which the jury could have found and did find that the rebound catalogs "were of good quality." Specifically, plaintiff notes the following: (1) several of the rebound catalogs were introduced into evidence; (2) Barbara Cole, defendant's vice-president of marketing, testified that she never received any complaints about the appearance of the rebound catalogs; (3) Don Carlson testified that plaintiff refused to reprint the catalogs because it concluded that the catalogs were printed properly, as well as any it had printed for defendant and were "a first-class job"; (4) Dennis Uchimoto, plaintiff's expert witness, testified that the approximately 5,000 catalogs he examined were well within industry standards in appearance and appropriateness of binding and trimming and were commercially acceptable.

■ ■ A judgment *n.o.v.*, like a directed verdict, may be entered

only where all the evidence, when viewed in its aspect most favorable to the nonmovant, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504.) In view of the evidence cited by plaintiff, *all* the evidence, when viewed in its aspect most favorable to plaintiff, does not so overwhelmingly favor defendant's contention that the catalogs were nonconforming to the contract that the verdict for plaintiff cannot stand. That is, the evidence of the nonconformity of the catalogs is not sufficient to warrant the entry of a judgment *n.o.v.* for defendant on the grounds that the catalogs failed to conform to the contract specifications.

■ In this regard we note that section 2—106(2) of the Code defines goods as "conforming" to a contract when they are in accordance with the obligations under the contract. (Ill. Rev. Stat. 1981, ch. 26, par. 2—106(2).) Uniform Commercial Code Comment 2 to section 2—106 states, *inter alia*, that subsection (2) is generally "intended to continue the policy of requiring exact performance by the seller of his obligations as a condition to his right to require acceptance," *i.e.*, the perfect-tender rule (*Zabriskie Chevrolet, Inc. v. Smith* (1968), 99 N.J. Super. 441, 240 A.2d 195). It further states that "usage of trade frequently permits commercial leeways in performance and the language of the agreement itself must be read in the light of such custom or usage and also, prior cause of dealing." (Ill. Ann. Stat., ch. 26, par. 2—106, Uniform Commercial Code Comment 2, at 104 (Smith-Hurd 1963).) However, we must also note that, notwithstanding the perfect-tender rule, the reasonableness of a buyer's rejection of goods and whether such rejection of goods is in good faith are ultimately matters for the trier of fact. 4 R. Anderson, Uniform Commercial Code §2—601:15, at 55-56 (1983).

■ Moreover, we find meritless, as a basis on which to assail the verdict for plaintiff, the contention that the evidence overwhelmingly reveals that defendant did not accept all of the catalogs. That contention does not aid defendant for it makes the verdict for plaintiff supportable on a ground not pleaded by plaintiff in its complaint but finding ample support in the record. Assuming that defendant did not accept, *i.e.*, rejected, most of the catalogs, the failure of the evidence to overwhelmingly reveal that the catalogs were nonconforming would require the conclusion that defendant's rejection was wrongful. As a consequence, plaintiff would have been entitled to maintain the very action on which it prevailed here, *i.e.*, an action for the price, under a different section of the Code than those on which it did rely. Section 2—709(b) allows the recovery of the price of goods identified to the

contract where, as we believe is true here, the circumstances reasonably indicate that efforts to resell the goods would be unavailing. Ill. Rev. Stat. 1981, ch. 26, par. 2—709(b).

■ Defendant alternatively contends that the trial court erred in refusing to direct a finding that it had not accepted all the catalogs and, based thereon, to reduce the verdict for plaintiff accordingly or order a new trial to determine the reasonable value of the catalogs it did accept. As already noted, the evidence does not so overwhelmingly reveal that the catalogs were nonconforming that the verdict for plaintiff cannot stand. As also noted, overwhelming evidence that defendant rejected most of the catalogs would make that rejection wrongful and would make defendant's liability for the entire contract price supportable under section 2—709(b). As such, that defendant did not accept all of the catalogs did not entitle it to a directed finding of such fact and, more importantly, a reduction in the plaintiff's verdict or a new trial based on that finding.

■ Under *Pedrick*, the grant of directed verdicts in jury cases is subject to the same standard as the grant of judgments *n.o.v.* in such cases. The difference, if any, between directed verdicts and directed findings in such cases is insufficient to warrant evaluation of a party's right to the latter under a lesser standard than that governing the entry of directed verdicts. Therefore, the evidence must be both overwhelming and favorable to the movant to warrant a motion for a directed finding in a jury case. That was not true here with respect to the evidence of defendant's rejection of most of the catalogs. We find no error in the trial court's denial to defendant of a directed finding and reduced verdict or new trial.

Defendant next contends that certain given jury instructions constituted error in that they misled the jury, *i.e.*, failed to inform it of the applicable law and the facts, and effectively directed a verdict for plaintiff. Defendant also contends that the trial court's rejection of defendant's instructions 7 and 8 deprived defendant of its defense.

■ Preliminarily, we must note that the inquiry as to whether the failure to give defendant's instructions 7 and 8 constituted reversible error is separate and distinct from the inquiry as to whether defendant was entitled to a judgment *n.o.v.* or a directed finding and a reduced verdict for plaintiff or a new trial. Our concern with respect to the latter issue was whether the evidence, when viewed in its aspect most favorable to plaintiff, so overwhelming favored defendant that no verdict for plaintiff could ever stand. Our concern with respect to the former issue is whether the trial court prejudiced defendant. (*Korpalski v. Lyman* (1983), 114 Ill. App. 3d 563, 449 N.E.2d 211.) As

such, that defendant was not entitled to a judgment *n.o.v.* or directed finding absent overwhelming evidence contrary to the verdict for plaintiff does not require the conclusion that, even had it been given defendant's instructions 7 and 8, the jury would not have found that the preponderance of the evidence supported a different or lesser verdict than that which it returned.

■ Parties have the right to have the jury instructed on their theories of the case, all issues reasonably presented by the evidence (*Lounsbury v. Yorro* (1984), 124 Ill. App. 3d 745, 464 N.E.2d 866), the principles of law applicable and the necessary facts to be proved to support a verdict (*Korpalski v. Lyman* (1983), 114 Ill. App. 3d 563, 449 N.E.2d 211). The test is whether the jury instructions, taken as a whole, are sufficiently clear so as not to mislead and whether they fairly and correctly state the law. However, as noted above, only if prejudice has resulted from the erroneous refusal of an instruction is a reversal for a new trial required. (*Korpalski*, 114 Ill. App. 3d 563, 449 N.E.2d 211.) Judging the trial court's refusal to give defendant's tendered instructions 7 and 8 to the jury by this criteria, we believe that it was reversible error.

Defendant's instruction 7 stated:

> "Regarding the proof of acceptance, a buyer's use of properly rejected goods does not constitute acceptance where the use is reasonable in light of the buyer's inability to obtain suitable substitute goods; where the use of the goods fulfills the buyer's duty to mitigate damages; where there is no prejudice to the seller, specifically where the seller has not [*sic*] other market for the goods; where the buyer's use is necessitated by duress or oppressive conduct by the seller; and where the buyer's use of the goods was with the seller's express or implied consent to do so."

Defendant's instruction 8 stated:

> "In arriving at your decision as to whether the buyer exercised such ownership over the goods in question as to constitute acceptance of the goods, you must apply the test of reasonableness as to such use of the goods by the buyer."

Defendant asserts that these instructions were supported by the law and the evidence and therefore should have been given the jury. As plaintiff chiefly disagrees that the relevant law supported these instructions, we examine it in depth.

■ Section 2—601 of the Code provides that "if the goods *** fail in any respect to conform to the contract, the buyer may (a) reject the whole; or (b) accept the whole; or (c) accept any commercial unit

or units and reject the rest." (Ill. Rev. Stat. 1981, ch. 26, par. 2—601.) Section 2—105 defines a commercial unit as "such a unit of goods as by commercial usage is a single whole for purposes of sale and division of which materially impairs its character or value on the market or in use." (Ill. Rev. Stat. 1981, ch. 26, par. 2—105.) Section 2—606 provides that acceptance of goods occurs when a buyer, *inter alia*, after a reasonable time to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity or does any act inconsistent with the seller's ownership of the goods. (Ill. Rev. Stat. 1981, ch. 26, pars. 2—606(a), (c).) Uniform Commercial Code Comment 4 to section 2—606 states that subsection (c) is subject to the Code sections permitting the buyer to take certain actions with regard to rejected goods without effecting an acceptance of the goods. (Ill. Ann. Stat., ch. 26, par. 2—606, Uniform Commercial Code Comment 4, at 445 (Smith-Hurd 1963).) One of these sections, section 2—604, provides that a buyer may store or resell rejected goods for the seller's account or may reship them to him where the seller has given no instructions within a reasonable time after notification of rejection. The Code comment to this section states that the listing of the buyer's options in the absence of instructions is not intended to be exhaustive but merely illustrative. Ill. Ann. Stat., ch. 26, par. 2—604, Uniform Commercial Code Comment, at 439 (Smith-Hurd 1953).

A buyer may thus use nonconforming goods without having that use constitute acceptance as a matter of law in all cases. The overriding rule is that, in determining whether a buyer has so wrongfully exercised ownership over the goods as to be barred from rejecting them, the trier of fact must apply a rule of reasonableness. (See *Frank's Maintenance & Engineering, Inc. v. C. A. Roberts Co.* (1980), 86 Ill. App. 3d 980, 408 N.E.2d 403 (and cases cited therein).) That *Frank's Maintenance* as well as the cases cited therein and the other cases defendant cites may be factually distinguishable does not alone, as plaintiff asserts, make the general legal principles articulated therein inapplicable here. Rather, we believe that under all the facts and circumstances of this case, the rule cited from *Frank's Maintenance* was applicable here and that defendant's instruction 8, which was based on that rule, should have been given to the jury.

The "rule of reasonableness" articulated by the court in *Frank's Maintenance* finds support elsewhere. As previously noted, the reasonableness of a rejection of goods is ordinarily a question for the trier of fact. (4 R. Anderson, Uniform Commercial Code §2—601:15, at 55-56 (1983).) It would be nonsensical to acknowledge the

validity of that rule and at the same time hold that a buyer did not have the right to have the jury instructed thereon. Moreover, not only is the reasonableness of a rejection a question of fact but, indeed, "[w]hether conduct has amounted to an acceptance or a rejection of goods is a question of fact 'to be determined within the framework of the facts of each particular case.' " 4 R. Anderson, Uniform Commercial Code §2—606:16, at 102-03 (1983).

There is also ample support in the case law for defendant's instruction 7. In *Can-Key Industries, Inc. v. Industrial Leasing Corp.* (1979), 286 Or. 173, 593 P.2d 1125, the Oregon Supreme Court reasoned that, while a rejecting buyer should not in all cases be allowed to use the goods as if he were the owner, in many cases, the use of goods is not only reasonable in that it minimizes waste but may be required under the buyer's statutory duty to minimize damages. (See Ill. Rev. Stat. 1981, ch. 26, par. 2—715.) The court concluded that these competing policies must be considered when the scope of any act inconsistent with the seller's ownership, which constitutes acceptance under section 2—606, is at issue. *Can-Key Industries, Inc.*, 286 Or. at 183, 593 P.2d at 1131.

■■■ Plaintiff distinguishes *Can-Key* on the grounds that it merely involved a holding that testing the defective machine which constituted the goods in that case did not amount to acceptance. As previously noted, that *Can-Key* is factually distinguishable does not make the principles applied therein to determine whether a buyer's conduct constituted acceptance of goods inapplicable here. Just as the buyer's conduct in that case did not constitute acceptance under the appropriate test, it may be that defendant's conduct here would not have been held to have constituted acceptance of all the catalogs if that test had been applied by the jury here. We cannot say that defendant was not entitled to have the jury instructed as provided in its instruction 7 as regards the mitigation of damages.

■■■ Defendant was also entitled to have the jury instructed as provided in that instruction as regards the inability to obtain suitable substitute goods, the absence of prejudice to the seller, any oppressive conduct by the seller, and the seller's consent. It has been stated that "[t]he reasonableness of the buyer's use of a defective good after a revocation [of acceptance] is a question of fact for the jury that is to be based on the facts and circumstances of each case." (*Johannsen v. Minnesota Valley Ford Tractor Co.* (Minn. 1981), 304 N.W.2d 654, 658.) Among the factors that the jury may consider are "the degree of economic and other hardship that the buyer would suffer if he discontinued using the defective good; the reasonableness of the buyer's

use after revocation as a method of mitigating damages; the degree of prejudice to the seller; and whether the seller acted in bad faith." *Johannsen v. Minnesota Valley Ford Tractor Co.* (Minn. 1981), 304 N.W.2d 654, 658.

Similarly, in *Fablok Mills, Inc. v. Cocker Machine & Foundry Co.* (1973), 125 N.J. Super 251, 310 A.2d 491, the court stated, in determining whether the continued use of knitting machines after revocation of acceptance precluded a rescission of the contract:

> "[A]voidance of an absolute rule against continued use is counseled by the overriding requirement of reasonableness which permeates the Code. We conceive that in certain situations continued use of goods by the buyer may be the most appropriate means of achieving mitigation, *i.e.*, where the buyer is unable to purchase a suitable substitute for the goods." (125 N.J. Super. at 257-58, 310 A.2d at 494.)

The court considered the facts that, *inter alia*, the seller had not shown how the buyer's continued use prejudiced the seller, did not suggest that the buyer acted in bad faith or that the continued use could have been avoided. It also considered the fact that the seller was the only domestic source for the machines and that the buyer was confronted with the "grim choice of either continuing to use some of the machines or going out of business." (125 N.J. Super. at 258, 310 A.2d at 495.) Under these circumstances, the court concluded, to hold as a matter of law that the buyer "was required to discontinue his use of the goods and destroy his entire business would be contrary to the Code's rule of reasonableness and its underlying purposes and policies." (125 N.J. Super. at 258, 310 A.2d 495.) As such, it held that the reasonableness of the buyer's continued use of the machines was a question of fact for the jury. *Fablok Mills, Inc.*, 125 N.J. Super. at 257-58, 310 A.2d at 494-95.

Plaintiff distinguishes *Fablok Mills* on the grounds that there was no suitable substitute available for the machines used therein and the buyer's only alternative was to go out of business, *i.e.*, the buyer was under such extreme hardship that acceptance of the goods was excused. We find these inadequate grounds on which to find the principles applied in *Fablok Mills* inapplicable here. Specifically, we believe defendant's evidence sufficiently raised the issue of the availability of a substitute catalog in time to meet the second mailing date to warrant instructing the jury to consider that issue. Moreover, that defendant merely presented evidence that a failure to use the catalogs for the second mailing would have spelled financial disaster rather than forcing it out of business does not require the

conclusion that its use of the catalogs was unreasonable, and therefore constituted acceptance, as a matter of law. Rather, the reasonableness of its use of the catalogs under such a circumstance was a matter for the jury.

We thus conclude that the trial court's failure to give defendant's instructions 7 and 8 prejudiced defendant and requires a new trial. That failure effectively deprived defendant of its defense of "reasonableness" under the Code. Moreover, it also rendered certain instructions given the jury, which plaintiff tendered and defendant challenges, peremptory in nature. A peremptory instruction is one which the jury must implicitly obey, as one to return a verdict for one or the other party. (*Revak v. Village of Hanover Park* (1978), 67 Ill. App. 3d 531, 538, 384 N.E.2d 957.) The instructions tendered by plaintiff which defendant challenges were peremptory in nature because, in the absence of defendant's instructions 7 and 8, they required the jury to find that any use of the catalogs by defendant, regardless of the circumstances thereof, constituted an acceptance of all of the catalogs. As the relevant cases reveal, however, that is not the law. On remand, the trial court is instructed to reconsider the propriety of the instructions given the jury with regard to the views expressed herein.

Finally, the cases plaintiff cites holding that any business use, *i.e.*, use for profit, of purportedly rejected goods by the buyer constitutes acceptance as a matter of law (see, *e.g.*, *Fred W. Wolf Co. v. Monarch Refrigerating Co.* (1911), 252 Ill. 491, 96 N.E. 1063; *Brule C. E. & E., Inc. v. Pronto Foods Corp.* (1971), 3 Ill. App. 3d 135, 278 N.E.2d 477; *Lorenzo Banfi di Banfi Renzo & Co. v. Davis Congress Shops, Inc.* (N.D. Ill. 1983), 568 F. Supp. 432) do not compel a conclusion contrary to that which we have reached. *Wolf* is distinguishable in that it predates the Code, its underlying concern for commercial reasonableness and the cases which, under the statute, have tempered the absolute rule of acceptance articulated therein with a consideration for the reasonableness of the buyer's conduct under the circumstances of each case. *Brule* is distinguishable in that no facts were adduced showing, nor was any argument made therein, that the buyer's use of the goods was reasonable under the circumstances. In *Banfi Renzo* the court acknowledged the reasonable use rule of *Frank's Maintenance*. However, it properly held the rule inapplicable to a buyer who placed all the goods at issue in its inventory, offered them for sale and sold half of them. Defendant's conduct here was not of the same character as that of the buyer in *Banfi Renzo*.

Defendant lastly contends the trial court erred in awarding

plaintiff prejudgment interest under section 2 of "An Act in relation to the rate of interest and other charges in connection with sales on credit and the lending of money" (Ill. Rev. Stat. 1981, ch. 17, par. 6402). That section provides:

"Creditors shall be allowed to receive at the rate of five (5) per centum per annum for all moneys after they become due on any bond, bill, promissory note, or other instrument of writing ***." Ill. Rev. Stat. 1981, ch. 17, par. 6402.

After a due consideration of the arguments of the parties, we conclude the case law amply supports the award of prejudgment interest in this case. The principles applicable in determining the propriety of an award of prejudgment interest are:

"For interest to attach, prior to judgment, absent an agreement, the amount must be fixed, or determinable, and due, in the sense that a debtor-creditor relationship has come into being. (*Kansas Quality Construction, Inc. v. Chiasson*, 112 Ill. App. 2d 277, 250 N.E.2d 785.) If the amount is determinable, interest can be awarded on money payable even when the claimed right and the amount due require legal ascertainment (*L.W. Foster Sportswear Co. v. Goldblatt Bros., Inc.* (7th Cir. 1966), 356 F.2d 906, construing Illinois law), and the fact that the parties *** reasonably differ as to their liability is not a consideration so far as the statute is concerned. (*Kansas Quality Construction, Inc. v. Chiasson, supra.*)" *Martin v. Orvis Brothers & Co.* (1974), 25 Ill. App. 3d 238, 251, 323 N.E.2d 73.

Plaintiff's damages, if any, were and are sufficiently susceptible to simple and certain computation (*Emmenegger Construction Co. v. King* (1982), 103 Ill. App. 3d 423, 429, 431 N.E.2d 738) to justify the award of prejudgment interest here. In so concluding, we note that *L. W. Foster Sportswear Co.*, cited in *Martin*, involved amounts due on contracts for the sale of goods.

Moreover, *Cushman & Wakefield of Illinois, Inc. v. Northbrook 500 Limited Partnership* (1983), 112 Ill. App. 3d 951, 445 N.E.2d 1313, which defendant cites to argue that the amount due under the contract here depended upon a number of factors and was thus not easily ascertainable, is fundamentally inapposite. *Cushman* involved a claim for leasing commissions due a renting agent which were calculable under an extremely complex formula which included the rental amounts procured, the length of the leases and the identity of the procuring broker.

Defendant also asserts as factors upon which the amount due under the contract depended: whether use of a portion of the catalogs

constituted an acceptance of all of them; whether defendant was obligated to pay for the catalogs which it did not use; and whether it was entitled to a setoff in the contract price because the catalogs were nonconforming. It is obvious that the first two factors are merely a restatement of one factor. As to the third factor, before trial defendant settled its counterclaim for lost profits and consequential damages caused by plaintiff's alleged breaches of contract and the relevant warranties by producing defective catalogs. Defendant was thus not entitled to a setoff in plaintiff's damages, if any, due to the nonconformity of the catalogs. And, a right thereto was not a factor complicating the calculation of those damages. Therefore, if after a new trial, a verdict is returned for plaintiff, the trial court may again award prejudgment interest.

For all of the foregoing reasons, the judgment of the circuit court of Cook County is reversed and remanded for a new trial with instructions.

Reversed and remanded with instructions.

WHITE, P.J., and McNAMARA, J., concur.