**NORTH AMERICAN LIGHTING, INC., Plaintiff–Appellee,**

v.

**HOPKINS MANUFACTURING CORP., Defendant–Appellant.**

No. 93–1789.

United States Court of Appeals, Seventh Circuit.

Submitted Dec. 10, 1993.

Decided Oct. 19, 1994.

**1254**

Thomas F. Crosby, Winters, Brewster, Murphy, Crosby & Patchett, Marion, IL, Michael W. Klobnak, McCollum & Klobnak, Flora, IL, for plaintiff-appellee.

Pamela S. Lacey, Hart & Hart, Benton, IL, Thomas A. Krueger, Krueger Law Offices, Emporia, KS, for defendant-appellant.

Before CUMMINGS, FRIEDMAN * and CUDAHY, Circuit Judges.

CUDAHY, Circuit Judge.

Hopkins Manufacturing Corporation (Hopkins) appeals from a judgment for North American Lighting, Inc. (NAL) for refund of the partial purchase price of a headlight aiming system. The district court held that NAL had timely revoked its acceptance of the system and was not liable for the rental value of the system during the period prior to revocation. We affirm in part and reverse in part.

## I.

Hopkins produces headlight aiming systems and other photometric quality control devices. NAL produces headlamp assemblies for most major automobile manufacturers, including replaceable bulb headlamps. NAL needs to conform its replaceable bulb headlamps both to individual car maker specifications and, as required under the Motor Vehicle Safety Act, to industry standards. 15 U.S.C. §§ 1391–1426. Consistent with the Act, the Society of Automobile Engineers (SAE) promulgated standards which were then adopted by Federal Motor Vehicle Safety Standard No. 108 (Standard 108). Standard 108 addresses both performance and laboratory testing requirements, its goal being to facilitate the production of headlamps which adequately illuminate what a driver needs to see without blinding oncoming motorists. To achieve this goal, Standard 108 specifies maximum and minimum light intensities at 16 critical checkpoints arrayed on vertical and horizontal axes. To comply with the standard, NAL must exercise "due care," amounting to daily quality control testing of its output. This daily testing must be accurate and reliable, allowing not more than a ten percent deviation. Compliance with Standard 108 also requires that NAL test one headlight from each of its production lines using more accurate laboratory equipment to certify to the Department of Trans-

* The Honorable Daniel M. Friedman of the United States Court of Appeals for the Federal Circuit is sitting by designation.

portation that a given bulb, as designed and manufactured, meets federal specifications.

NAL's daily or "due care" testing equipment broke down permanently in 1989. At first, the company tried to satisfy its due care obligations by sending its bulbs to a testing laboratory in New York, but this practice became prohibitively expensive. NAL then assigned one of its engineers to lead a search for new due care testing equipment. The engineer had kept a file containing information from various manufacturers of photometric measuring devices, including Hopkins. Hopkins had allegedly developed a prototype aiming system which, with the assistance of computers, could also measure light intensity. NAL contacted Hopkins to obtain additional information about the prototype. Hopkins' sales manager responded by sending NAL a brochure describing its Machine Vision System (MVS). The brochure stated that the MVS performed functions beyond aiming: "[It] also has the capability of reading the [light] intensities at the points specified by SAE test procedures. It can provide a digital picture of the beam pattern and record [light] intensities at each point." Pl.'s Ex. 43. Next to this claim appeared the same light intensity checkpoints described in SAE J579. The brochure also stated that the MVS could be adapted with special software to perform additional functions.

In May, 1989, Hopkins offered NAL free use of the prototype MVS, dispatching two Hopkins employees to calibrate the device.[1] At that time, NAL's engineer expressed some concern that the MVS would not be able to test two of the sixteen checkpoints, but the two Hopkins employees assured him that Hopkins could add software to correct this problem. Further, there is evidence that either the two employees or Hopkins' sales manager told NAL's engineer that the MVS could be adapted to measure light intensity at the SAE checkpoints within 10% of known light intensities of certified headlamps. A few weeks after NAL began using the prototype MVS, NAL's engineer informed Hopkins that the system was providing inaccurate and inconsistent results. Hopkins again calibrated the system, causing results to improve for a short time before regressing.

Despite these problems, NAL decided to purchase an MVS, based largely on Hopkins' ongoing promises that software could be added to correct problems experienced with the prototype.[2] The permanent MVS was purchased in June 1989 for an invoice price of $79,548, ten percent of which NAL withheld pending completion of the promised software upgrades—including upgrades to allow testing of the two checkpoints about which NAL's engineer had expressed some concern. The permanent system, which arrived in August 1989, did not perform well. One NAL employee testified that the permanent system sometimes gave readings that varied more than 100% from the known light intensity properties of certified headlamps. On other occasions, the MVS would give a "zero" reading even though a light beam was present. Over the course of 210 days, 74% of the system's readings fell outside the required 10% accuracy range and the system failed to test at some of the checkpoints required by Standard 108.

There is evidence that the problems NAL experienced with the MVS also caused some concern at Hopkins. Office memoranda by high-level Hopkins personnel in May 1990 make reference to the "bad press" Hopkins was receiving in the field regarding the MVS: a third party had told Hopkins that NAL was very disappointed with the performance of the system and with Hopkins' performance in making the promised upgrades. One memorandum stated, "This kind of report will scuttle our efforts to sell Machine

---

1. Hopkins' sales manager testified that he had heard of the demise of NAL's due care testing equipment and that NAL was sending lamps to the New York testing laboratory. He offered NAL free use of the MVS "to help them in their time of trial." R.O.A. Doc. 37 at 40.

2. Hopkins contends that NAL did not request some of the software upgrades until after it had purchased the system. The precise timing of the upgrade requests seems unimportant, however, given Hopkins' express written assurances that the MVS had "the capability of reading the [light] intensities at the points specified by SAE test procedures."

Vision. We make promises we don't keep and we allow discrepancies in the unit to go uncorrected." Pl.'s Ex. 67.

Despite NAL's repeated requests, key software upgrades were not made until July 1990, at which time a Hopkins employee informed NAL that the MVS would never deliver the promised readings. The MVS continued to function poorly. Finally, it failed to power up in late July, 1990. NAL stopped using the MVS and began searching for a replacement system, in the meantime using its more sensitive certification testing equipment to satisfy its due care obligations under Standard 108. NAL claims that the replacement system was not operational until October, 1992. Discussions between NAL and Hopkins continued until June 19, 1991, when NAL informed Hopkins that acceptance had been revoked and that Hopkins should pick up the system.

NAL sued in state court to recover the amount it had tendered Hopkins in partial payment. The case was then removed to federal district court, at which time Hopkins filed an answer denying that NAL was entitled to a refund and counterclaiming for the unpaid purchase price, shipping charges and repair costs, as well as $33,600 for the reasonable rental value of equipment that Hopkins loaned to NAL. The parties then consented to trial by magistrate, whereupon NAL filed an amended complaint adding a claim that it had revoked its acceptance of the equipment. In response, Hopkins added affirmative defenses including acceptance, payment, waiver, estoppel and failure of consideration.

The magistrate judge adopted NAL's revocation of acceptance theory, finding that the system's non-conformity substantially impaired its value to NAL, that NAL reasonably assumed (in light of Hopkins' assurances) that this non-conformity would be cured and that NAL revoked within a reasonable time of acceptance. The judge then awarded NAL the total amount it had sought and, later, pre-judgment interest. The parties agree that Illinois law governs this dispute.

## II.

■ Both parties concede that NAL accepted the MVS. They disagree, however, on whether NAL could subsequently revoke its acceptance. Hopkins argues that, since NAL knew the existing capabilities and shortcomings of the MVS, there was no "non-conformity" upon which NAL could base its revocation. Hopkins relies on § 2–607(2) of Illinois' version of the Uniform Commercial Code (UCC), which provides:

(2) Acceptance of goods by the buyer ... *if made with knowledge of a non-conformity* cannot be revoked because of it unless the acceptance was on the reasonable assumption that the non-conformity would be seasonably cured....

810 ILCS 5/2–607(2) (emphasis added). Hopkins relies on this provision, as well as cases from this Circuit and from Illinois, to suggest that goods "conform" to the contract whenever the buyer knows or has reason to know that goods will not serve the function for which he bought them.

We, like the district court, reject this argument. The language of § 2–607(2) itself makes clear that the buyer can "know" of a non-conformity without destroying his right to revoke acceptance. *Id.* (buyer with knowledge of non-conformity may revoke where he accepted "on the reasonable assumption that the non-conformity would be ... cured"). And the authorities Hopkins cites in support of its notion of "non-conformity" demonstrate, at most, that, where a buyer accepts goods with an understanding of what they can and cannot do, he cannot later undo the contract, under certain conditions resulting from his acceptance. The condition allegedly precluding revocation of acceptance here is that this preclusion is based *solely* on the fact that the goods, while performing to his *expectations,* nevertheless failed to serve the *purpose* for which the buyer claims to have bought the goods. *See H.B. Fuller Co. v. Kinetic Sys., Inc.,* 932 F.2d 681, 683–87 (7th Cir.1991); *Brule C.E. & E. Inc. v. Pronto Foods Corp.,* 3 Ill.App.3d 135, 278 N.E.2d 477, 479 (1971).

But NAL does not seek to revoke based solely on the failure of the MVS to test light intensities at the Standard 108 checkpoints.

Rather, NAL seeks to revoke based on what it claims was its *reasonable acceptance based on Hopkins' assurances* that this failure would be rectified.[3] Indeed, the notion that NAL fully understood the capabilities of the MVS defies common sense. There is no suggestion that NAL failed to make a good faith effort to comply with Standard 108. NAL has repeatedly demonstrated its willingness to comply with the standard: by sending its headlamps to a New York laboratory, by trying to obtain software upgrades on the MVS, by using its sensitive certification equipment to perform due care testing (and thereby risking damage to that equipment) and by attempting to procure a replacement for the MVS as soon as the promised upgrades failed to enable the system to perform the required tests. It would be nonsensical to conclude that NAL acquired the MVS and spent months trying to have it upgraded merely to have the opportunity to sue, as it did below, for a refund of the purchase price and related expenses.

More plausible is NAL's version of the facts, which the district court accepted. NAL claims not to have discovered the non-conformity of which it complains, as indicated by its reliance on subsection (1)(b) of 810 ILCS 5/2–608.[4] This is entirely consistent with the record. NAL does not deny that it knew that the MVS was originally intended to serve as an aiming device and it admits that its engineer and other employees expressed at least some doubt as to Hopkins' ability to adapt the MVS for NAL's purposes. As we have indicated, however, these facts do not preclude the existence of a nonconformity. Rather, it follows that the undiscovered non-conformity NAL claims was not that the *unmodified* MVS could not perform the Standard 108 tests but rather that the system would not perform the tests *even after modifications*.

We are left, then, with the question whether, given NAL's failure for an extended period to discover that the MVS could not be modified to suit its purposes, NAL properly revoked. Specifically, we must determine whether NAL could, relying on Hopkins' alleged assurances, revoke its acceptance even after it had used the MVS for several months. We conclude that NAL could revoke.

A buyer who fails to discover a non-conformity and whose acceptance was reasonably induced by the seller's assurances may revoke acceptance where the non-conformity "substantially impairs" the value of a product to the buyer, provided that such revocation occurs within a reasonable time. 810 ILCS 5/2–608. The district court correctly identified this rule of law, leaving us only the task of determining whether the court correctly applied the law to the present facts. In particular, we must determine whether the district court correctly found reasonably induced acceptance, substantial impairment and timely revocation, all of which are questions for the trier of fact. *Alden Press, Inc. v. Block & Co., Inc.*, 173 Ill.App.3d 251, 123 Ill.Dec. 26, 30, 527 N.E.2d 489, 493 (1988); *GNP Commodities, Inc. v. Walsh Heffernan Co.*, 95 Ill.App.3d 966, 51 Ill.Dec. 245, 250, 255, 420 N.E.2d 659, 664, 669 (1981); *Sauers v. Tibbs*, 48 Ill.App.3d 805, 6 Ill.Dec. 762, 766, 363 N.E.2d 444, 448 (1977).

### A. Reasonably Induced Acceptance

A seller may be found to have given "assurances" within the meaning of § 2–608 based on either circumstantial evidence or the seller's explicit language and, where the seller has assured the buyer explicitly, revocation will be available whether or not the seller made the assurances in bad faith. 810 ILCS 5/2–608, UCC cmt. 3 at 380 (1993).

---

**3.** NAL thus relies on § 2–608(1)(b), which provides:

(1) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its values to him if he has accepted it

(b) without the discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

810 ILCS 5/2–608(1).

**4.** Subsection (1)(a), in contrast, allows the buyer to revoke even if he has discovered the non-conformity, provided that he accepted the product "on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured...." 810 ILCS 5/2–608(1)(a).

There is ample evidence in the record that Hopkins assured NAL that the MVS could be modified for the purpose of satisfying its due care obligations under Standard 108. Hopkins' written materials support this point, as does testimony by both NAL and Hopkins employees. As indicated, moreover, it would strain credulity to think that NAL would accept the device and expend resources over several months to modify it unless it had been persuaded, presumably by Hopkins, that the device could eventually suit its needs. Further, given the sophistication of the technology involved, the district court did not err in finding that NAL behaved reasonably in relying on Hopkins' assurances. While NAL's engineer and other employees may have alerted it to some limitations of the MVS, it stands to reason that NAL would defer to Hopkins regarding the capabilities of its products, especially since NAL does not itself make headlight aiming or photometric devices.

## B. *Substantial Impairment*

■ Whether the value of the product has been impaired is determined subjectively, from the buyer's perspective. *GNP Commodities*, 51 Ill.Dec. at 255, 420 N.E.2d at 669; *Blankenship v. Northtown Ford, Inc.*, 95 Ill.App.3d 303, 306, 420 N.E.2d 167, 170 (1981). Whether such impairment is "substantial," however, is determined based on the objective evidence. *GNP Commodities*, 51 Ill.Dec. at 255, 420 N.E.2d at 669. There can be little disagreement that NAL purchased the MVS to perform daily testing of its headlight assemblies at sixteen critical checkpoints, a function required of NAL by federal regulations. Nor is there any dispute that the MVS was never able to carry out this function. Indeed, the MVS eventually stopped working altogether. Thus, there was "substantial impairment" of the device's value within the meaning of § 2–608.

## C. *Timely Revocation*

■ Section 1–204(2) of the UCC indicates that what is a "reasonable time" for revocation depends on the nature, purpose and circumstances of the transaction. 810 ILCS 5/1–204(2). In particular, the period where revocation is allowable may be extended where the seller gives continuous assurances, *GNP Commodities*, 51 Ill.Dec. at 252, 420 N.E.2d at 666, and where the seller fails, after repeated attempts, to repair defects of which the buyer complains, *Smith v. Navistar Int'l Transp. Corp.*, 714 F.Supp. 303, 309 (N.D.Ill.1989), *aff'd*, 957 F.2d 1439 (7th Cir. 1992). Here, there is substantial evidence that Hopkins made express written and oral assurances, with respect to both the loaned prototype MVS and the permanent system that arrived in August, 1989. These assurances—and Hopkins' failure to make good on them—were sufficient both to cause concern at Hopkins and to induce NAL to continue working with Hopkins to upgrade the system. NAL's responsiveness to such inducement was reasonable for much the same reason that NAL's acceptance of the system was reasonable: NAL could reasonably defer to Hopkins' superior expertise with the device's technology until the promised software upgrades failed to make the device viable. That NAL did not seek to revoke during the several months between delivery of the permanent system and the upgrades attests, perhaps, to NAL's desperation to find a more economical method of satisfying its due care obligations, but such delay did not make NAL's revocation untimely given Hopkins repeated assurances and the other facts of this case. We reject Hopkins' argument that NAL could not revoke simply because it used the MVS. Consistent with the Code, Illinois courts have rejected the notion that any use by the buyer constitutes an irrevocable acceptance by the buyer, "hav[ing] tempered [this] absolute rule of acceptance with a consideration for the reasonableness of the buyer's conduct." *Alden Press*, 123 Ill.Dec. at 34, 527 N.E.2d at 497. It would be inequitable to require NAL to pay for the MVS in full if it reasonably delayed revocation in order to allow Hopkins to make good on its promises. Indeed, given the clear evidence that Hopkins assured NAL that the system could be adapted for due care purposes, Hopkins' product use argument comes dangerously close to suggesting a rule that would allow sellers to "lock in" purchasers of goods by promising them the moon—only to bring them back to earth when they attempted to

revoke the acceptance that they were persuaded to give because of their failure to understand fully a substantial defect. Thus, there was timely revocation of acceptance here.

### III.

■ The district court held that Hopkins presented no evidence that NAL had agreed to pay shipping charges or rent as alleged in Hopkins' counterclaims seeking compensation for NAL's receipt and use of the loaner prototype MVS between May and August of 1989. We agree with this conclusion since the facts suggest that neither party expected that Hopkins would be compensated for loaning the prototype, presumably because the loaned equipment would serve to demonstrate the system's capabilities and would help induce NAL to purchase a permanent system.

■ With respect to the permanent system, however, we conclude that some compensation is due Hopkins. As indicated, where revocation of acceptance has been established, the aggrieved buyer's remedies are the same as those afforded a buyer who has rejected the goods. 810 ILCS 5/2–608(3). These remedies are set out at 810 ILCS 5/2–711, which does not specifically provide for an offset for beneficial use prior to revocation of acceptance. However, the Code does state: "Unless displaced by the particular provisions of this Act, the principles of law and equity ... shall supplement its provisions." 810 ILCS 5/1–103. Such supplementary principles include quantum meruit recovery. In order to be successful on a theory of quantum meruit under Illinois law, a party must prove performance of the services, reasonable value of the services, and the receipt by the defendant from the plaintiff of a benefit which it would be unjust for him to retain without paying the complaining party. *Van C. Argiris & Co. v. FMC Corp.*, 144 Ill.App.3d 750, 98 Ill.Dec. 601, 603–04, 494 N.E.2d 723, 725–26 (1986); *O'Neil & Santa Claus, Ltd. v. Xtra Value Imports,*

*Inc.,* 51 Ill.App.3d 11, 8 Ill.Dec. 78, 81, 365 N.E.2d 316, 319 (1977); *Production Process Consultants, Inc. v. William R. Hubbell Steel Corp.,* 988 F.2d 794, 796 (7th Cir.1993).

As indicated, there is substantial evidence that NAL knew that there were problems in adapting the MVS to enable NAL to satisfy its due care obligations. Thus, even though it would appear that NAL was not aware that the MVS would not suit its needs even after the promised software upgrades were finally made, it seems equally clear that NAL purchased the device knowing that its performance would be, at least initially, suboptimal. That NAL continued to use the device instead of finding alternative methods of testing the bulbs—but, as we have indicated, there is no indication of bad faith on NAL's part—indicates that the device served some beneficial use. The fairness of this result is supported by the fact that NAL, at the time of its revocation, itself proposed that NAL pay rental fees through July, 1990 in exchange for a refund of the portion of the purchase price already paid.[5] Further, Hopkins presented testimony that another of Hopkins' devices with similar capabilities was on lease for $3,300 per month and that, based on this figure and the amount that NAL was spending to send its assemblies to the New York laboratory, a reasonable rental figure for the MVS would be $1,600 per month. These facts, while sparse, seem to satisfy the general requirements for quantum meruit recovery. Thus, we remand to the district court to consider—based on these facts and whatever other evidence the district court, in its discretion, deems appropriate—what rental value would be reasonable compensation for NAL's use of the permanent MVS from the time of its arrival in August, 1989 until the time of NAL's timely revocation some months later.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART.

---

**5.** In the letter in which NAL revoked, its counsel stated: "My client would consider your company [Hopkins] picking up the equipment upon payment by your company of the amounts paid toward the purchase price *less reasonable monthly rental fees through July 1990."* Pl.'s Ex. 41 (emphasis added).